Cindy CHANG, Plaintiff,

v.

NORTHWESTERN MEMORIAL HOSPITAL et al., Defendants.

No. 79 C 141.

United States District Court,
N. D. Illinois, E. D.

Nov. 3, 1980.

Patricia C. Bobb, Philip H. Corboy, Chicago, Ill., for plaintiff.

Miles J. Zaremski, Wildman, Harrold, Allen & Dixon, Lee J. Dunn, Jr., Gen. Counsel, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

GRADY, District Judge.

■ Plaintiff, a Taiwanese national, has brought this medical malpractice action against Northwestern Memorial Hospital and Dr. Robert Turner. Jurisdiction is based on diversity of citizenship. Defendants have filed a motion to dismiss, alleging that plaintiff is not a citizen of a "foreign state" recognized by the United States for purposes of diversity jurisdiction. In addition, it is argued that this court should refuse to hear this case under the doctrine of abstention, since an identical lawsuit was subsequently filed in state court. We will deny the motion.

The facts in this case read like a law school examination. On February 7, 1977, plaintiff was allegedly given an injection of actinomycin–D in her right hand, causing serious nerve damage. She was at this time a patient at Northwestern Memorial Hospital. Plaintiff, a citizen of Taipei, Taiwan, commenced this instant action in federal court on January 12, 1979, some 12 days after President Carter broke off official diplomatic relations with Taiwan in favor of recognition of the People's Republic of China "as the sole legal government of China." Presidential Memorandum of December 30, 1978, 3195–01–M, 44 Federal Register 1075 (Jan. 4, 1979). Defendants Northwestern Memorial Hospital and Dr. Turner are residents of Illinois. For purposes of tolling the statute of limitations, plaintiff filed the identical action in state court on March 12, 1979. *See* Plaintiff's Supplemental Memorandum in Reply to Defendant's Supplemental Memo in Support of their Motion to Dismiss, p. 3.

Article III, section 2 of the United States Constitution provides that

[t]he judicial Power shall extend to all Cases ... between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

Section 1332(a)(2) of Title 28 of the United States Code implements this provision, vesting the district courts with jurisdiction over civil actions between state citizens and citizens of foreign countries. This power has

been referred to as alienage jurisdiction.[1] *Sadat v. Mertes,* 615 F.2d 1176, 1182 (7th Cir. 1980).

█ The generally accepted test for determining if a plaintiff can sue in the federal court is whether he or she is a citizen of a foreign state recognized by the United States government at the time of the commencement of the suit. *Land Oberoesterreich v. Gude,* 109 F.2d 635, 637 (2d Cir. 1940); *Windert Watch Co., Inc. v. Remex Electronics Ltd.,* 468 F.Supp. 1242, 1244 (S.D.N.Y.1979); *Klausner v. Levy,* 83 F.Supp. 599, 600 (E.D.Va.1949).[2] It is the President who has the constitutional authority to recognize and derecognize nations. *Goldwater v. Carter,* 617 F.2d 697, 707–708 (D.C.Cir.1979), *vacated on other grounds,* 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979); *Banco National de Cuba v. Sabbatino,* 376 U.S. 398, 410, 84 S.Ct. 923, 930, 11 L.Ed.2d 804 (1964); *United States v. Pink,* 315 U.S. 203, 228–230, 62 S.Ct. 552, 564–565, 86 L.Ed. 796 (1942); U.S. Const. art. II, § 3 (The President "shall receive Ambassadors and other public Ministers").

Article VI, § 4 of the 1948 Treaty of Friendship, Commerce and Navigation between the United States of America and the Republic of China, 63 Stat. 1300 states in relevant part:

> The nationals, corporations and associations of either High Contracting Party shall enjoy freedom of access to the courts of justice and to administrative tribunals and agencies in the territories of the other High Contracting Party, in all degrees of jurisdiction established by law, both in pursuit and in defense of their rights.

On December 30, 1978, President Carter issued a memorandum on "Relations with the People of Taiwan." Presidential Memorandum of December 30, 1978, 3195–01–M, 44 Federal Register 1075 (Jan. 4, 1979).

1. Alienage jurisdiction is founded on "more concrete concerns than the arguably unfounded fears of bias or prejudice by forums in one of the United States against litigants from another of the United States." *Sadat v. Mertes,* 615 F.2d 1176, 1182 (7th Cir. 1980). The dominant considerations which prompted the provision for such jurisdiction appear to have been:

   (1) Failure on the part of the individual states to give protection to foreigners under treaties;
   (2) Apprehension of entanglements with other sovereigns that might ensue from failure to treat the legal controversies of aliens on a national level.

   *Blair Holdings Corp. v. Rubinstein,* 133 F.Supp. 496, 500 (S.D.N.Y.1955). Alienage jurisdiction, then, was intended to provide the federal courts with a form of protective jurisdiction over matters possibly implicating international relations. *See* The Federalist No. 80 (A. Hamilton); American Law Institute, *Study of the Division of Jurisdiction Between State and Federal Courts* 108 (1969).

2. *Klausner v. Levy,* 83 F.Supp. 599 (E.D.Va. 1949), did add the requirement that there be "formal" recognition of a country by the United States government to satisfy Article III, § 2 and § 1332(a)(2) diversity jurisdiction. We regard this as a gloss, however, on the recognition requirement, not supported by the history of the provisions or early judicial decisions. *See* Friendly, "The Historical Basis of Diversity Jurisdiction," 41 Harv.L.Rev. 483, 484 *et seq.* (1928); *Russian Socialist Federated Soviet Republic v. Cibrario,* 235 N.Y. 255, 139 N.E. 259, 260 (1923) ("if recognized, [the foreign government or citizen] undoubtedly may [sue]") and cases cited therein. Moreover, to support the requirement of formal recognition, the *Klausner* court cited *Land Oberoesterreich v. Gude,* 109 F.2d 635 (2d Cir. 1940), a case which requires mere "recognition by our government." 109 F.2d at 637.

   We digress on the recognition versus formal recognition point because it is generally acknowledged by both the Executive Branch and the courts that diplomatic relations with Taiwan have now formally ended. *Goldwater v. Carter,* 617 F.2d 697, 708 (D.C.Cir.1979), vacated because of nonjusticiable political question, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979); Executive Order 12143, 44 Federal Register 37191 (June 22, 1979).

   Beyond our difficulties with the *Klausner* decision, certain policy concerns support a mere "recognition" standard for alienage diversity jurisdiction. There must be flexibility in foreign affairs as we approach the 21st century, so that the United States and the citizens may maintain "commercial, cultural and other relations" with another nation and its citizens even in the absence of official diplomatic relations. *See* Presidential Memorandum of December 30, 1978, 3195–01–M, 44 Federal Register 1075 (Jan. 4, 1979). Allowing only foreign nationals of countries "formally recognized" by the United States to sue in our federal courts would impair that flexibility.

Pursuant to this document, official diplomatic relations with the Republic of China were terminated as of January 1, 1979. Nonetheless, the President declared that "[e]xisting international agreements and arrangements in force between the United States and Taiwan" shall remain "in force." *Id.*

The Taiwanese Relations Act was enacted on April 10, 1979. P.L. 96–8, 93 Stat. 14. While not conferring any new jurisdiction on the federal courts, the Act explicitly recognizes that

> [t]he capacity of Taiwan to sue and be sued in courts in the United States, in accordance with the laws of the United States, shall not be abrogated, infringed, modified, denied, or otherwise affected in any way by the absence of diplomatic relations or recognition.

93 Stat. at 16, Sect. 4(b)(6). "Taiwan" includes the "islands of Taiwan and the Pescadores, the people on those islands . . . . " 93 Stat. at 20–21, Sect. 15(2). We reject defendants' hypertechnical argument that the plaintiff is not covered by this definition because she was not physically present on the island when she sustained the injury and filed her suit.

Finally, the President issued Executive Order 12143 on June 22, 1979, "superced[ing]" the earlier presidential memorandum of December 30, 1978. 44 Federal Register 37191, 37192. Defendants contend

that this order abolished any existing rights of Taiwanese citizens to sue in the federal courts. A close examination of this order, however, does not support this interpretation. A savings clause included in the order specifically protects existing treaty agreements:

> Agreements and arrangements referred to in paragraph (B) of [the Presidential Memorandum of December 30, 1978] shall continue in force and shall be performed in accordance with the [Taiwanese Relations] Act and this Order.

44 F.R. at 37192–93. Thus the 1948 U.S.–Taiwan Friendship Treaty provision on access to our courts by Taiwanese nationals remains in effect.

Moreover, to avoid any possible confusion, we requested the plaintiff to obtain a determination from the U.S. State Department as to whether Executive Order 12143 altered the ability of Taiwanese nationals to sue in the federal courts. The Assistant Legal Adviser for Treaty Affairs of the State Department responded that the order

> was not intended in any way to abrogate, infringe, or otherwise modify the right of natural and juridical persons from Taiwan to sue in the courts of the United States.

Exhibit C to Affidavit of Plaintiff's Attorney Regarding Compliance with Court's Order of February 1, 1980.[3]

---

**3.** It seems clear that something less than formal recognition of a state by the United States government will suffice to satisfy the foreign diversity jurisdiction requirement. The authorities suggest a *de facto* recognition standard, and we find such recognition here based on significant trade relations, cultural and/or other contacts with a nation on a nongovernmental level. These contacts and relations cannot violate the letter or intent of any treaty, executive order, emergency regulation or other directive of the Executive Branch.

As we have already indicated, our government has sought to preserve "extensive, close, and friendly relations between the people of the United States and the people on Taiwan." Taiwan Relations Act ("the Act"), § 2(a)(2), Pub.L. No. 96–8, 93 Stat. 14, 22 U.S.C. § 3301. Relations between the United States government and the authorities on Taiwan are conducted through a nonprofit corporation, the American Institute in Taiwan. Section 6 of Act, 93 Stat.

17, 22 U.S.C. § 3305. The Institute carries out "programs, transactions and other relations" on behalf of our government subject to the directives of the President. Section 6(a) of Act. The acts performed by authorized employees of the Institute are of "like force and effect . . . as if performed by any other person authorized under the laws of the United States to perform such acts." Section 7(b) of Act, 93 Stat. 17, 22 U.S.C. § 3306. Thus, not only are private commercial relations with Taiwan permitted, but quasi–governmental relations under the auspices of this Institute are provided for by the Act.

The *de facto* approach used here has its roots in earlier decisions. For example, in 1900 it was held that Cuba was a "foreign state" for purposes of diversity jurisdiction during the period following the Spanish–American War, when Cuba was occupied by U.S. troops. *Betancourt v. Mutual Reserve Fund Life Insur-*

We note that there is ample authority for requesting and obtaining guidance from the Executive branch in a matter within that branch's purview. *P & E Shipping Corp. v. Banco Para El Comercio Exterior De Cuba,* 307 F.2d 415, 418 (1st Cir. 1962) (case remanded to ascertain from the State Department whether Cuban entity can sue in federal court during cessation of diplomatic relations); *Murarka v. Bachrack Bros., Inc.,* 215 F.2d 547, 552 (2d Cir. 1954) (district court properly relied on State Department communication in finding *de facto* recognition of India by the United States in 1947). *See Electronic Data Systems Corp. v. Social Security Organization of Iran,* 610 F.2d 94–95 (2d Cir. 1979) (district court on remand of attachment order may interpret the U.S.–Iranian Treaty of Amity, Economic Relations and Consular Relations in light of available State Department documents). Indeed, the Second Circuit in the *Electronic Data System* case stated that it may be advisable for the district court to "ascertain the position of the Department of State concerning the defendants' [governmental agency of Iran] right to access to United States courts under the extraordinary circumstances now prevailing" with the Islamic Republic of Iran. 610 F.2d at 95.

Having determined that plaintiff Chang may bring her action in this court, the question remains whether we should dismiss it under the doctrine of abstention. Under this doctrine, a district court *may* decline to exercise or in certain cases postpone the exercise of its jurisdiction over a properly filed case. At first blush, it may seem desirable to dismiss the action and allow the identical state court suit to proceed: It is a garden variety professional negligence case

and a complex array of *federal* constitutional questions confront us in the federal court. These questions, however, have now been resolved. Moreover, abstention from the exercise of federal jurisdiction is the "exception, not the rule." *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). It is an extraordinary and narrow exception to the duty of the district court to adjudicate controversies properly before it. "Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest." *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188–189, 79 S.Ct. 1060, 1062–1063, 3 L.Ed.2d 1163 (1959). *Federal Savings and Loan Insurance Corp. v. Krueger,* 435 F.2d 633, 637 (7th Cir. 1970). It was never intended "that a federal court should exercise its judicial discretion to dismiss a suit merely because a State court could entertain it." *Alabama Public Service Commission v. Southern Railway Co.,* 341 U.S. 341, 361, 71 S.Ct. 762, 774, 95 L.Ed. 1002 (1961) (Frankfurter, J., concurring in result).

Moreover, the instant case does not fall within the traditional applications of the abstention doctrine. First, this case does not involve a federal constitutional challenge where a state court determination of unsettled questions of local law may avoid the need to decide the constitutional questions. *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). *Pullman* dealt with the

---

*ance Ass'n.,* 101 F. 305, 306 (Circuit Court S.D.N.Y.1900). In *Murarka v. Bachrack Brothers, Inc.,* 215 F.2d 547 (2d Cir. 1954), the Second Circuit upheld jurisdiction over a British Indian citizen whose complaint had been filed while India was still in the process of obtaining independence from England and under an interim government. The court found *de facto* recognition of India by the United States because of an exchange of ambassadors. *Id.* at 552. *See Windert Watch Co., Inc. v. Remex Electronics Ltd.,* 468 F.Supp. 1242, 1245 (S.D.N.Y.1979) ("The United States has not ac-

corded Hong Kong recognition, *de facto* or otherwise; Hong Kong is a crown colony, not a "free and independent sovereign."). *See also Kletter v. Dulles,* 111 F.Supp. 593, 598 (D.D.C. 1953), *affirmed sub nom., Kletter v. Herter,* 268 F.2d 582 (U.S.App.D.C.1959), *cert. denied* 361 U.S. 936, 80 S.Ct. 378, 4 L.Ed.2d 357 (Palestine found to be a foreign state within the meaning of U.S. expatriation statute, despite the fact that it was under British rule during relevant time period; court looked to presence of most favored nation provision in treaty of commerce with Palestine in 1932).

construction of a state administrative regulation where state adjudication may "displace tomorrow" the federal decision on the equal protection, due process and commerce clause claims under the United States Constitution. 312 U.S. at 500. Of course, the ruling made by this court on the ability of the instant plaintiff to sue in federal court is a question limited to the federal forum. No action by a state tribunal would have or could have any effect on that result. Moreover, *Pullman*–type abstention has only been employed to stay a federal action pending resolution of the local law questions, not to dismiss it. 17 Wright and Miller, *Federal Practice and Procedure*, § 4241, at p. 433.

Second, there is no difficult question of state law bearing on an issue of public policy to warrant abstention. *See, e. g., Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959) (scope of eminent domain power of municipalities under state law); *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) (impermissibly disruptive effect on state policy for the management of oil fields). The state law claims presented in the case at bar involve settled principles of state law, with no explicit or implicit state policies brought into question.

Third, the *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and *Huffman v. Pursue Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), line of abstention cases, restraining state criminal and quasi–criminal proceedings, is not relevant here.

Finally, we must consider a fourth hybrid category of abstention enunciated in *Colorado River Water Conservation District v. United States, supra*, resting on "considerations of '[w]ise judicial administration, . . . [including] conservation of judicial resources and comprehensive disposition of litigation.'" 424 U.S. at 817, 96 S.Ct. at 1246. The Supreme Court in *Colorado River* explained the relevant factors involved in this principle:

[T]he circumstances permitting the dismissal of a federal suit due to the presence of a concurrent state proceeding . . . are considerably more limited than the circumstances appropriate for [traditional] abstention. . . . In assessing the appropriateness of dismissal in the event of an exercise of concurrent jurisdiction, a federal court may . . . consider such factors as the inconvenience of the federal forum, the desirability of avoiding piecemeal litigation, and the order in which jurisdiction was obtained by the concurrent forums. No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counselling against that exercise is required. Only the clearest of justifications will warrant dismissal.

424 U.S. at 818–819, 96 S.Ct. at 1246–1247 (citations omitted). Applying these factors in the instant case, the only "inconvenience" of this forum is to the court itself, caused by the need to adjudicate complex constitutional and jurisdictional questions. This work has now been done. In addition, all issues can be fully adjudicated in this court and plaintiff filed her federal action first. Although the avoidance of duplicative litigation is an important end, the mere "pendency of an action in state court is no bar to proceedings concerning the same matter in the Federal court. . . ." *Colorado River Water Conservation District v. United States, supra*, 424 U.S. at 817, 96 S.Ct. at 1246, citing *McClellan v. Carland*, 217 U.S. 268, 282, 30 S.Ct. 501, 504, 54 L.Ed. 762 (1910). We doubt, in fact, that any significant duplication will occur in this case should we deny the motion to dismiss: plaintiff will probably dismiss the state action, which she only filed to toll the statute of limitations. "[T]he plaintiff has not proceeded with discovery or done anything of a substantive nature with regard to this [state] cause of action, because of her intention to proceed only in Federal Court, the forum of her right and her choice." Plaintiff's Supplemental Reply Memorandum, p. 4.

Where collateral actions are filed in state and federal court, the resolution of the abstention issue is committed to the district court's discretion. *Will v. Calvert Fire Insurance Co.*, 437 U.S. 655, 663–664, 98 S.Ct. 2552, 2558–2559, 57 L.Ed.2d 504 (1978).[4] "[T]he virtually unflagging obligation of the federal courts to exercise the jurisdiction given them," *Colorado River*, 424 U.S. at 817, 96 S.Ct. at 1246, however, can result in an abuse of that discretion. In a case directly bearing upon our present inquiry, the Seventh Circuit Court of Appeals reversed the dismissal of a properly filed diversity action because of the pendency of similar state court litigation. *Liberty Mutual Insurance Co. v. Pennsylvania Railroad Co.*, 322 F.2d 963 (1963). While "commending" the district court's motives, the Court held in the context of an action on an insurance contract that

> a federal district court is without authority to abdicate its admitted diversity jurisdiction by dismissing the action solely on the ground that other litigation is pending in a state court involving substantially the same parties and subject matter in order to obtain complete justice and avoid multiple litigation.

322 F.2d at 965, 968. *Accord, Augustin v. Mughal*, 521 F.2d 1215, 1217 (8th Cir. 1975) (fact that a diversity claim sounding in negligence could be litigated in pending state proceeding filed subsequent to federal action does not justify district court's dismissal on abstention ground).

We therefore find that abstention is not warranted in this case. Defendants' motion to dismiss is denied.

---

**4.** The Supreme Court in *Will v. Calvert Fire Insurance Co.* specifically held that the issuance of a writ of mandamus by the Seventh Circuit impermissibly interfered with a district judge's discretion to stay consideration of a federal action until the completion of a state proceeding.