**Domenico RUGGIERO,**
**Plaintiff-Appellant,**

v.

**COMPANIA PERUANA DE VAPORES "INCA CAPAC YUPANQUI",**
**Defendant-Appellee.**

**Simon DODSON, Plaintiff-Appellant,**

v.

**POLSKI LINIE OCEANICZNE GDYNIA, "DOMEYKO", Defendant-Appellee.**

**Ciro LOCASCIO, Plaintiff-Appellant,**

v.

**P. M. JAKARTA LLOYD "DJATIPRANA", Defendant-Appellee.**

**Nos. 577, 698 and 699, Dockets 80–7595, 80–7597 and 80–7599.**

United States Court of Appeals, Second Circuit.

Argued Jan. 5, 1981.

Decided Jan. 15, 1981.

Irving B. Bushlow, Brooklyn, N. Y., for plaintiffs-appellants.

Thomas Healey, New York City, Healey & McCaffrey, New York City, for defendant-appellee Polski Linie Oceaniczne Gdynia, "Domeyko".

Giallorenzi & Campbell, New York City, for defendant-appellee P. M. Jakarta Lloyd "Djatiprana".

Cichanowicz & Callan, New York City, for defendant-appellee Compania Peruana De Vapores "Inca Capac Yupanqui".

Bruno A. Ristau, Dept. of Justice, Washington, D. C., Alice Daniel, Asst. Atty. Gen., Eloise E. Davies, Dept. of Justice, Washington, D. C., Edward R. Korman, U. S. Atty., E. D. New York, Brooklyn, N. Y., for intervenor-appellee United States of America.

Before FEINBERG, Chief Judge, and FRIENDLY and KEARSE, Circuit Judges.

FRIENDLY, Circuit Judge:

The plaintiffs in these three cases are longshoremen seeking damages for personal injuries incurred in New York due to the alleged negligence of a shipowner, as authorized by the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 905(b).[1] In each case the defendant is a shipping company incorporated under the laws of and wholly owned by a foreign government—Peru, Poland and Indonesia, respectively. In each case the plaintiff made a jury demand, F.R.Civ.P. 38(b), and the defendant moved to strike it as inconsistent with the Foreign Sovereign Immunities Act of 1976 (the "Immunities Act"), 90 Stat. 2891 (1976). In a well-considered opinion, 498 F.Supp. 10, the district court granted the defendants' motions but wisely included the certificate for interlocutory appeals specified by 28 U.S.C. § 1292(b). This court gave leave for such appeals. The United States as intervenor, 28 U.S.C. § 2403(a), submitted a thorough brief in support of the district court's action. The district court's decision runs counter to those of some district courts in other circuits[2] and we are advised by counsel that the issue is pending on appeal in at least two of them.[3]

The Immunities Act was intended to be a comprehensive revision of the law with respect to suits against foreign states or entities owned by them. As said in the report of the House Committee, House Report No. 94–1487, 94th Cong.2d Sess., p. 6, reprinted in, [1976] 5 U.S.Code Cong. & Ad.News, pp. 6604, 6604:

> The purpose of the proposed legislation as amended, is to provide when and how parties can maintain a lawsuit against a foreign state or its entities in the courts of the United States and to provide when a foreign state is entitled to sovereign immunity.

The extent of the changes wrought by the Immunities Act so far as concerns the question before us can be best understood by comparing 28 U.S.C. § 1332, as it stood before the 1976 enactment (below, on the left), so far as here pertinent, with 28 U.S.C. §§ 1330(a) and 1332(a) as they existed thereafter (on the right).

---

1. The district court's statement that the suits sought damages under the Jones Act was mistaken. It has been suggested, however, that "§ 905(b) incorporates the Jones Act", Gilmore & Black, The Law of Admiralty 455 (2d ed. 1975). See also note 8 infra.

2. *Icenogle v. Olympic Airways*, 82 F.R.D. 36, 39 (D.D.C.1979); *Rex v. Cia. Peruana de Vapores*, 493 F.Supp. 459 (E.D.Pa.1980); *Houston v. Murmansk Shipping Co.*, 87 F.R.D. 71 (D.Md. 1980); *Lonon v. Companhia de Navegacao Lloyd Basileiro*, 85 F.R.D. 71 (E.D.Pa.1979). Cf. *Williams v. Shipping Corp. of India*, 489 F.Supp. 526 (E.D.Va.1980) (no jury trial in removed action against shipping company owned by foreign state) and *Jones v. Shipping Corp. of India, Ltd.*, 491 F.Supp. 1260 (E.D.Va.1980) (same). Defendants' counsel advised us at argument that in some ten cases like those here at issue which are now pending in the Southern and Eastern Districts of New York, judges have stricken demands for jury trials.

3. Appeal from the decision in *Rex v. Cia. Peruana de Vapores, supra*, is pending in the Third Circuit. Appeals from the decisions in *Williams v. Shipping Corporation of India, supra*, and *Houston v. Murmansk Shipping Co., supra*, are pending in the Fourth.

§ 1332. Diversity of citizenship; amount in controversy; costs

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between—

(1) citizens of different States;

(2) citizens of a State, and foreign states or citizens or subjects thereof; and

(3) citizens of different States and in which foreign states or citizens or subjects thereof are additional parties.

§ 1330. Actions against foreign states

(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

§ 1332. Diversity of citizenship; amount in controversy; costs

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between—

(1) citizens of different States;

(2) citizens of a State and citizens or subjects of a foreign state;

(3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

(4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

To this must be added some of the provisions referred to in the new § 1330(a).[4] Sections 1603(a) and (b) provide:

§ 1603. Definitions

For purposes of this chapter—

(a) A 'foreign state', except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

(b) An 'agency or instrumentality of a foreign state' means any entity—

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (d) of this title, nor created under the laws of any third country.

Section 1605(a)(2) provides:

§ 1605. General exceptions to the jurisdictional immunity of a foreign state

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

\* \* \* \* \* \*

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

The Immunities Act also added a new 28 U.S.C. § 1441(d), reading as follows:

§ 1441. Actions removable generally

\* \* \* \* \* \*

(d) Any civil action brought in a State court against a foreign state as defined in section 1603(a) of this title may be removed by the foreign state to the district

---

4. These provisions, found in Chapter 97 of Title 28, are preceded by a preamble, 28 U.S.C. § 1602, reading as follows:

§ 1602. Findings and declaration of purpose
The Congress finds that the determination by United States courts of the claims of foreign states to immunity from the jurisdiction of such courts would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts. Under international law, states are

not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities. Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter.

court of the United States for the district and division embracing the place where such action is pending. Upon removal the action shall be tried by the court without jury. Where removal is based upon this subsection, the time limitations of section 1446(b) of this chapter may be enlarged at any time for cause shown.

 One need scarcely go beyond this to conclude that, as a matter of statutory construction, no jury can be had in an action in a federal court against a foreign state as broadly defined in § 1603—a definition within which the defendants here concededly fall—when, as here, federal jurisdiction is sought to be predicated on § 1332(a). The provisions of former § 1332(a)(2) and (3), which would have provided a basis of jurisdiction over actions by a citizen against a foreign state prior to 1976, were deleted and were replaced by § 1330(a), which by its clear terms provides only for a non-jury civil action against foreign states as the statute generously defines them.

We find no force in plaintiffs' argument that their actions may be maintained against state-owned corporations, although not as against states themselves, under § 1332(a)(2) authorizing suits between "citizens of a State and citizens or subjects of a foreign state", which imposes no restriction on jury trial. It had long been settled that a corporation created under the laws of a foreign state was regarded for purposes of diversity jurisdiction as a "citizen or sub-ject" of that state. *Steamship Co. v. Tugman*, 106 U.S. 118, 1 S.Ct. 58, 27 L.Ed. 87 (1882).[5] Hence, the argument runs, a plaintiff suing entities like these defendants has an option. He can sue them as foreign states under § 1330(a), with a bar against a jury trial being demanded by either side; alternatively he can sue them under § 1332(a)(2), and where, as here, the action is in tort or any other subject ordinarily triable to a jury, he may have a jury trial on demand as other diversity plaintiffs may.

We are convinced that so such option exists. The argument ignores the provision of § 1330(a) which defines each of these defendants as a foreign state. The same entity cannot be both a foreign state and a citizen or subject of a foreign state. The historic justification for considering foreign corporations to be citizens or subjects of the state of incorporation was that their shareholders were citizens or subjects of that state, see note 5 *supra,* and that the suit must be regarded as against them. Section 1603 destroys that fiction with respect to the entities therein defined by providing that for the purposes of the Immunities Act they are to be regarded as states themselves.[6] The conclusion is inescapable from the language of the statute that Congress meant § 1330 to be the exclusive means whereby a plaintiff may sue any foreign state as defined in § 1603(a), at least on the basis of diversity jurisdiction theretofore

**5.** This ruling was thought, 106 U.S. at 120–21, 1 S.Ct. at 59 to follow inevitably from the earlier holding in *Ohio & Mississippi R. R. v. Wheeler,* (1 Black) 66 U.S. 286, 296, 17 L.Ed. 130 (1862), " 'that where a corporation is created by the laws of a State, the legal presumption is, that its members are citizens of the State in which alone the corporate body has a legal existence; and that a suit by or against a corporation, in its corporate name, must be presumed to be a suit by or against citizens of the State which created the corporate body; and that no averment or evidence to the contrary is admissible, for the purposes of withdrawing the suit from the jurisdiction of a court of the United States.' "

**6.** Some argument is made that since § 1603 begins with the words "For purposes of this chapter", to wit, Chapter 97, the reach of the definition of "foreign state" does not extend to Chapter 85 where § 1332 is located. This reasoning *is obviously flawed since* § 1330(a), which is also in Chapter 85, itself refers to § 1603(a), and sections 1330 and 1332 must be read together.

Counsel also argues, somewhat inconsistently, that Congress' direct reference to § 1603 in §§ 1330(a) and 1441(d) and the absence of such a reference in § 1332(a)(2) somehow show that Congress did not intend to withdraw jurisdiction under § 1332 in this class of cases. This argument fails also since there simply was no reason for Congress to refer to § 1603 in § 1332(a)(2).

provided in § 1332(a)(2), and that this entails a non-jury trial.[7]

The district court in *Rex v. Compania Peruana de Vapores, supra*, 493 F.Supp. at 467, developed an alternative theory for allowing jury trial in actions such as these. This was that since such actions arose under a law of the United States, to wit, the LHWCA, jurisdiction exists under 28 U.S.C. § 1331, and that there is no more bar against jury trial in such suits than the court thought there would be in a similar action against a private shipowner.[8] Although this jurisdictional basis is not alleged in these complaints, apparently was not developed in the district court, and has not been specifically argued by plaintiffs here save through copious citation of the *Rex* opinion, we think it best to consider it. See *Cohen v. West Haven Board of Police Commissioners*, 638 F.2d 496–500 n.6 (2 Cir. 1980). Although this argument avoids the

anomaly of the same entity being both a foreign state under § 1330(a) and a citizen or subject of a foreign state under § 1332(a)(2), we nevertheless reject it. We can think of no reason why Congress would wish a plaintiff suing a foreign state on a claim arising under the Constitution, a law or a treaty of the United States to have a jury trial whereas a person suing on a non-statutory claim would not. If any distinction were to be made, it would run the other way. The courts must learn to accept that, in place of the familiar dichotomy of federal question and diversity jurisdiction, the Immunities Act has created a tripartite division—federal question cases, diversity cases and actions against foreign states. If a case falls within the third division, there is to be no jury trial even if it might also come within one of the other two.[9]

These conclusions, emerging with sufficient clarity from the language of the Im-

---

7. An additional consideration strongly supporting this conclusion is the new § 1441(d) dealing with removal. It is transparently clear that if an entity like these defendants had been sued in a state court and had removed to federal court on the basis that diversity jurisdiction existed under § 1332(a)(2), jury trial in federal court would be barred by § 1441(d). *Williams v. Shipping Corp. of India, supra; Jones v. Shipping Corp. of India, Ltd., supra.* We can perceive no reason why Congress should have wished the situation to be different when suit was initiated in federal court.

Defendants point to another anomaly consequent on plaintiffs' construction, namely, that corporations owned by foreign states would be subject to jury trial in suits when the amount in controversy exceeded $10,000, but not when it was $10,000 or less.

8. The court may well have been mistaken in assuming there would be a right to jury trial in such cases when § 905(b) afforded the sole basis for federal jurisdiction. Unlike the Jones Act, 46 U.S.C. § 688, 33 U.S.C. § 905(b) does not explicitly provide for a jury trial. The lack of any such reference would seem to require that in suits where no other basis for federal jurisdiction exists, the courts would have to consider the problems dealt with in *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 359–80, 79 S.Ct. 468, 473–84, 3 L.Ed.2d 368 (1959), and its progeny. See the discussion of this and related procedural issues with respect to § 905(b) in Gilmore & Black, The Law of Admiralty, *supra* at 455, 470–71. The Fifth Circuit has recently held that § 905(b) cannot be a basis for federal jurisdiction under 28

U.S.C. § 1331 and that § 905(b) actions invoke admiralty jurisdiction under 28 U.S.C. § 1333, which, of course, confers no right to jury trial, *Russell v. Atlantic & Gulf Stevedores*, 625 F.2d 71 (1980). We leave all this to the future.

9. We also do not understand the fear of the district judge in *Rex, supra* 493 F.Supp. at 468, that under our construction of § 1330

[a] district court would not only no longer have jurisdiction over a suit against a commercial corporation that happened to be owned fifty-one percent by a foreign state under 28 U.S.C. § 1332, but in addition there would be no jurisdiction in federal question cases (28 U.S.C. § 1331); civil rights actions (28 U.S.C. § 1343); or other actions relating to regulation of interstate commerce (28 U.S.C. § 1337), all of which traditionally are tried by a jury.

Under § 1330 the district courts have jurisdiction of all actions against commercial corporations owned by foreign states as defined in § 1603. All that is prohibited is jury trial.

Our conclusion with respect to § 1331 jurisdiction is reinforced by § 1441(d), see note 7 *supra*. Clearly if a foreign state, as defined in § 1603(a), were to base removal on the existence of a federal question, § 1441(d) would bar a jury trial. As stated in 1 Moore, Federal Practice ¶ 0.66[4] at 700.180, "Of course it would be within the power of Congress to provide for a jury trial in original actions but not in removed actions, but the reason for such a distinction is obscure."

munities Act, are fortified by the House and Senate Reports. Although these can profitably be read in their entirety, a few passages deserve special emphasis.

Under the heading "Statement", the reports note:

> At present, there are no comprehensive provisions in our law available to inform parties when they can have recourse to the courts to assert a legal claim against a foreign state. Unlike other legal systems, U.S. law does not afford plaintiffs and their counsel with a means to commence a suit that is specifically addressed to foreign state defendants. It does not provide firm standards as to when a foreign state may validly assert the defense of sovereign immunity; and, in the event a plaintiff should obtain a final judgment against a foreign state or one of its trading companies, our law does not provide the plaintiff with any means to obtain satisfaction of that judgment through execution against ordinary commercial assets.

House Report, *supra*, [1976] 5 U.S.Code Cong. & Ad.News at 6605, Senate Report No. 94–1310, 94th Cong.2d Sess. at 8. The bill aimed to remedy these evils. An important goal was to "codify the so-called 'restrictive' principle of sovereign immunity", wherein "the immunity of a foreign state is 'restricted' to suits involving a foreign state's public act (jure imperii) and does not extend to suits based on its commercial or private acts (jure gestionis)." A "principal purpose" of the bill was "to transfer the determination of sovereign immunity from the executive branch to the judicial branch, thereby reducing the foreign policy implication of immunity determinations and assuring litigants that these often crucial decisions are made on purely legal grounds and under procedures that insure due process."

The reports' discussion of § 1330(a) is of particular relevance. They state:

> (a) *Subject Matter Jurisdiction.*—Section 1330(a) gives Federal district courts original jurisdiction in personam against foreign states (defined as including political subdivisions, agencies, and instrumen-

talities of foreign states). The jurisdiction extends to any claim with respect to which the foreign state is not entitled to immunity under sections 1605–1607 proposed in the bill, or under any applicable international agreement of the type contemplated by the proposed section 1604.

> As in suits against the U.S. Government, jury trials are excluded. See 28 U.S.C. 2402. Actions tried by a court without jury will tend to promote a uniformity in decision where foreign governments are involved.

House Report, *supra*, at 6611–12, Senate Report, *supra*, at 12. Of almost equal importance is the discussion of § 3 of the bill, entitled "Diversity Jurisdiction as to Foreign States":

> Section 3 of the bill amends those provisions of 28 U.S.C. 1332 which relate to diversity jurisdiction of U.S. district courts over foreign states. Since jurisdiction in actions against foreign states is comprehensively treated by the new section 1330, a similar jurisdictional basis under section 1332 becomes superfluous. The amendment deletes references to 'foreign states' now found in paragraphs (2) and (3) of 28 U.S.C. 1332(a), and adds a new paragraph (4) to provide for diversity jurisdiction in actions brought by a foreign state as plaintiff. These changes would not affect the applicability of section 1332 to entities that are both owned by a foreign state and are also citizens of a state of the United States as defined in 28 U.S.C. 1332(c) and (d). See analysis to section 1603(b).

House Report, *supra*, at 6613, Senate Report, *supra*, at 13–14. Discussing the new § 1441(d) the reports state that this broadens the removal rights of a foreign state but that:

> Upon removal, the action would be heard and tried by the appropriate district court sitting without a jury. (*Cf.* 28 U.S.C. 2402, precluding jury trials in suits against the United States.) Thus, one effect of removing an action under the new section 1441(d) will be to extinguish a demand for a jury trial made in the

state court. (*Cf.* rule 81(c), F.R.Civ.P.) Because the judicial power of the United States specifically encompasses actions 'between a State, or the Citizens thereof, and foreign States' (U.S. Constitution, art. III, sec. 2, cl. 1), this preemption of State court procedures in cases involving foreign sovereigns is clearly constitutional.

House Report, *supra*, at 6632, Senate Report, *supra*, at 32. The reports thus confirm what is patent from the statutory language—Congress wished to provide a single vehicle for actions against foreign states or entities controlled by them, to wit, § 1330 and § 1441(d), its equivalent on removal, and to bar jury trial in each. In return for conferring upon plaintiffs this clear basis of jurisdiction in actions against foreign states (even in suits for $10,000 or less), codifying the restrictive principle of sovereign immunity and vesting its determination in the courts §§ 1602–05, providing a feasible method of service of process, § 1608, and authorizing execution of a judgment upon property of a foreign state, § 1610, Congress intended that the foreign state, defined broadly in § 1603, was not to be subjected to jury trial—a form of trial alien to most of them in civil cases and from which the United States, in granting consent to suit, has generally exempted itself. 28 U.S.C. § 2402.

■ This brings us to the plaintiffs' arguments that deprivation of jury trial in actions such as these violates the Seventh Amendment or, at least, that this claim has sufficient substance that we should endeavor to construe the statute so as to avoid the constitutional question. *United States v. Thirty-Seven Photographs*, 402 U.S. 363, 369, 91 S.Ct. 1400, 1404, 28 L.Ed.2d 822 (1971).

The Seventh Amendment provides, so far as here pertinent, that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved. . . ." It is undisputed that a suit against a foreign state was unknown to the common law. As said by Chief Justice Marshall in *The Schooner Exchange v. McFaddon*, (7 Cranch) 11 U.S. 116, 136–37 (1812), since all sovereigns possess "equal rights and equal independence" under international law, a sovereign enters the territory of a friendly foreign government "in the confidence that the immunities belonging to his independent sovereign station, though not expressly stipulated, are reserved by implication, and will be extended to him." The Schooner Exchange was a military vessel, and the question whether the doctrine there expounded applied to vessels or other property of a foreign state used for commercial purposes did not reach the Supreme Court until *Berizzi Brothers Co. v. S. S. Pesaro*, 271 U.S. 562, 46 S.Ct. 611, 70 L.Ed. 1088 (1926). After quoting extensively from *The Schooner Exchange* and the well-known English case, *The Parlement Belge*, 5 P.D. 197 (C.A.1880) the Court said per Mr. Justice Van Devanter:

> We think the principles are applicable alike to all ships held and used by a government for a public purpose, and that when, for the purpose of advancing the trade of its people or providing revenue for its treasury, a government acquires, mans and operates ships in the carrying trade, they are public ships in the same sense that war ships are. We know of no international usage which regards the maintenance and advancement of the economic welfare of a people in time of peace as any less a public purpose than the maintenance and training of a naval force.

271 U.S. at 574, 46 S.Ct. at 612.

However, international usage did change, see *Victory Transport, Inc. v. Comisaria General de Abastecimientos y Transportes*, 336 F.2d 354, 357–58 (2d Cir. 1964), *cert. denied*, 381 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698 (1965), and authorities there cited, and in the 1940's the Court began to recognize that the decision whether to recognize immunity for liabilities arising out of commercial transactions by states or state-owned entities should depend on whether the State Department considered that disallowance of sovereign immunity

for state commercial transactions would adversely affect the foreign relations of the United States. See *Ex parte Republic of Peru*, 318 U.S. 578, 589, 63 S.Ct. 793, 800, 87 L.Ed. 1014 (1943); *Republic of Mexico v. Hoffman*, 324 U.S. 30, 65 S.Ct. 530, 89 L.Ed. 729 (1945). Some years later Jack B. Tate, the Acting Legal Adviser to the Department of State, wrote the Acting Attorney General, 26 Dept. State Bull. 984 (1952), a letter that has become famous, advising that "It will be hereafter the Department's policy to follow the restrictive theory of sovereign immunity", i. e., a theory denying such immunity to commercial activities of states or of entities controlled by them. The resolution of a claim of immunity by a foreign government thus came to depend to a considerable degree on what kind of letter it could obtain from the Department of State, although the courts sometimes acted without benefit of the Department's views. See, e. g., the notable opinion of Judge J. Joseph Smith for this court in *Victory Transport, Inc., supra.* See also M. Cardozo, Sovereign Immunity: The Plaintiff Deserves a Day in Court, 67 Harv.L.Rev. 608 (1954); Lowenfeld, Claims Against Foreign States—A Proposal for Reform of United States Law, 44 N.Y.U.L.Rev. 901 (1969); Belman, New Departures in the Law of Sovereign Immunity, [1969] Proceedings Am.Soc. Int'l Law 182; Reeves, The Foreign Sovereign Before United States Courts, 38 Fordham L.Rev. 455 (1970). As revealed in the congressional reports cited above, the unsatisfactory character of this situation led to development of the Immunities Act which establishes the right to sue a foreign state within the limits of the restrictive theory of immunity, as judicially determined. Apparently the question of whether a jury trial should be accorded in an action against a foreign state allowed under the restrictive immunity doctrine was not litigated in the interval between the United States' recognition of that theory and adoption of the Immunities Act. See 5 Moore, Federal Practice ¶ 38.31.1[2] at 38–248.

As Professor Moore has stated, "The Seventh Amendment creates no right of trial by jury", 5 Moore, Federal Practice ¶ 38.-08[5] at 38–55. Its function rather is preservation. "[I]f the action is a common law suit or the particular issues arise in a common law suit, but no right of jury trial existed under the common law of England as to that type of action, then there is no right to jury trial by virtue of the Seventh Amendment." *Id.* We have been pointed to nothing to show that a right of jury trial existed under the common law in 1791 with respect to a suit against a foreign government or an instrumentality thereof; such a suit could not be maintained at all.

The Supreme Court has applied this analysis in instances when the United States has from time to time waived its immunity from suit but has not provided for a jury trial. In *McElrath v. United States*, 102 U.S. 426, 26 L.Ed. 189 (1880), the Court upheld the denial of a jury trial of a contract claim against the United States in the Court of Claims, even though the claimant, against whom the Government had counterclaimed, ended up owing money to it. The Court said:

> Suits against the government in the Court of Claims, whether reference be had to the claimant's demand, or to the defence, or to any set-off, or counterclaim which the government may assert, are not controlled by the Seventh Amendment. They are not suits at common law within its true meaning.

The Court reiterated this view in *Galloway v. United States*, 319 U.S. 372, 388, 63 S.Ct. 1077, 1086, 87 L.Ed. 1458 (1943):

> It may be noted, first, that the Amendment has no application of its own force to this case. The suit is one to enforce a monetary claim against the United States. It hardly can be maintained that under the common law in 1791 jury trial was a matter of right for persons asserting claims against the sovereign.

See also *Glidden Co. v. Zdanok*, 370 U.S. 530, 572, 82 S.Ct. 1459, 1484, 8 L.Ed.2d 671

(1962) (plurality opinion of Mr. Justice Harlan).[10]

Plaintiffs challenge the validity of this analogy on the basis of a difference between a sovereign's submitting itself to suit in its own courts by consent and compelling other sovereigns to submit to suit in its courts because of a changed climate in international law. Some differences there doubtless are,[11] but they are not significant for the issue here at hand. A suit against a foreign state was just as much unknown to the common law of 1791 as was a suit against the United States. The two situations are also alike in that denial of jury trial may rationally enter into the decision to create jurisdiction. Surely one reason why the United States has coupled its waiver of sovereign immunity in certain types of cases with a refusal to submit itself to jury

trial was the fear that juries might draw too heavily on a deep pocket. See 86 Cong. Rec. 12028 (1940) (remarks of Rep. Celler). By the same token Congress could legitimately consider that a partial withdrawal of sovereign immunity from foreign states would interfere with United States' international relations unless such states were accorded protection similar to what it had given itself. Foreign countries can hardly object to the United States' subjecting them to trial by a judge in commercial cases when the United States itself is subject to the same sort of trial in its own courts and in theirs. Subjection to trial by jury, especially with the restraints on review of jury findings also imposed by the Seventh Amendment, would be a different matter, especially since the great majority of countries do not use a civil jury.[12] We do not at

10. Plaintiffs' reply brief calls our attention to a recent article, Kirst, Jury Trial and the Federal Tort Claims Act: Time to Recognize the Seventh Amendment Right, 58 Texas L.Rev. 549 (1980). Conceding that "[e]very federal district court and court of appeals that has faced the issue has concluded that the denial of jury trial in FTCA actions does not violate the seventh amendment", id. at 550, Professor Kirst attacks the rather cryptic statements of the Supreme Court in McElrath and Galloway on grounds of both history and principle. He argues, id. at 563, 82 S.Ct. at 1479, that "[i]n 1791 it was possible to sue the Crown in a common law action in which there was trial by jury", referring to the petition of right, which required the king's consent, and the monstrans de droit and the traverse of office. Although the superiority of the two latter remedies caused the petition of right to fall into disuse for two centuries after 1614, judges continued to mention it, see, e. g., the dissenting opinion of Justice Iredell in Chisholm v. Georgia, (2 Dall.) 2 U.S. 419, 437–46 (1793); and Blackstone described the procedures, 3 Blackstone, Commentaries on the Law of England 47–48 (Facsimile ed., U.Chi.Press 1979). Apparently all three remedies began in the "petty bag" office of the chancellor but, according to Blackstone, "if any fact be disputed between the parties, the chancellor cannot try it, having no power to summon a jury; but must deliver the record propria manu into the court of king's bench, where it shall be tried by the country, and judgment shall be there given thereon." Id. at 48. See also 9 Holdsworth, History of English Law 13–29 (1926); Jaffe, Suits Against Governments and Officers: Sovereign Immunity, 77 Harv.L.Rev. 1, 1–16 (1963). However, the Supreme Court stated in United States v. Lee, 106 U.S. 196, 238–39, 1

S.Ct. 240, 275–76, 27 L.Ed. 171 (1882), that: "The English remedies of petition of right monstrans de droit, and traverse of office, were never introduced into this country as part of our common law." Beyond this, if we should assume with Professor Kirst that in 1791 it was generally possible for an English subject to have a remedy against the Crown and that factual issues were tried to juries, this would not necessarily mean that the framers regarded such proceedings as "suits at common law". We think it unnecessary for us to pursue this further. Whatever the Supreme Court may decide with respect to Professor Kirst's arguments if these are presented in a case it deems appropriate for review, we are bound by McElrath and Galloway, as well as our own decisions in Cargill, Inc. v. Commodity Credit Corp., 275 F.2d 745, 748 (1960) and Birnbaum v. United States, 588 F.2d 319, 335 (1978), that the Seventh Amendment does not apply in suits against the United States.

11. E. g., Mr. Justice Holmes' explanation that "[a] sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends." Kawananakoa v. Polyblank, 205 U.S. 349, 353, 27 S.Ct. 526, 527, 51 L.Ed. 834 (1907). See also United States v. Lee, supra, 106 U.S. at 206, 1 S.Ct. at 248.

12. Whatever our enthusiasm over the jury may be, this is not necessarily shared by foreign governments—particularly those which may fear that at one time or another they may be politically unpopular with Americans.

all mean by this that the Seventh Amendment can be avoided simply because that seems a good idea; we mean rather that there are sufficient reasons why newly authorized suits against foreign sovereigns, authoritatively determined to have been unknown to the common law in 1791, are *sui generis* and should not be deemed to be within the scope of the Seventh Amendment's preservation of jury trial.

Against this, plaintiffs rely on *Curtis v. Loether*, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974), and *Pernell v. Southall Realty*, 416 U.S. 363, 94 S.Ct. 1723, 40 L.Ed.2d 198 (1974). *Curtis* rejected the argument that the Seventh Amendment "is inapplicable to new causes of action created by congressional enactment", 415 U.S. at 193, 94 S.Ct. at 1007, and announced that "[t]he Seventh Amendment does apply to actions enforcing statutory rights, and requires a jury trial upon demand, if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law." *Id.* at 194, 94 S.Ct. at 1008. But this and the holding in *Pernell* with respect to dispossess proceedings in the District of Columbia mean only that when Congress enlarges domestic substantive law or alters procedure in cases governed by it, the Seventh Amendment protects the right to jury trial if the new substantive right or proceeding is analogous to a suit at common law in 1791. See *Curtis, supra*, 415 U.S. at 195–96, 94 S.Ct. at 1008–09. They do not purport to deal with the unusual situation where the bar to a suit at common law was that the defendant, by virtue of its character as a sovereign, was not suable at all. The last thing that the *Curtis* and *Pernell* Courts can be thought to have had in mind was congressional action giving plaintiffs a new right to sue foreign states under the restrictive theory of sovereign immunity—a right having no analogy in the common law. Plaintiffs have presented no reason, and we can perceive none, why the framers of the Bill of Rights would have wished to create a situation whereby the new government could relax the immunity from suit otherwise enjoyed by it and other sovereigns only by subjecting them to what are deemed by some to be the great vicissitudes of jury trial.[13]

We likewise reject the argument that the Immunities Act must be read to afford a jury trial to these plaintiffs in order to avoid grave constitutional doubts. As Justice Cardozo stated in *George Moore Ice Cream Co. v. Rose*, 289 U.S. 373, 379, 53 S.Ct. 620, 622, 77 L.Ed. 1265 (1933):

> [A]voidance of a difficulty will not be pressed to the point of disingenuous evasion. Here the intention of the Congress is revealed too distinctly to permit us to ignore it because of mere misgivings as to power. The problem must be faced and answered.

See to the same effect *Swain v. Pressley*, 430 U.S. 372, 378 n.11, 97 S.Ct. 1224, 1228 n.11, 51 L.Ed.2d 411 (1977); *United States v. Batchelder*, 442 U.S. 114, 122, 99 S.Ct. 2198, 2203, 60 L.Ed.2d 755 (1979). Here the principle that foreign states as defendants, in the broad sense defined in § 1603, shall not be subject to jury trial in the federal courts, and can avoid such a trial in the state courts by removal, was set forth by Congress with clarity. Indeed it is one of the very bases of the statute, and we cannot be certain that Congress would have passed the Act without it. Under such circumstances our duty is to decide the constitutional question, not to avoid it.

The orders striking the jury demands are affirmed.

---

**13.** The lack of any provision safeguarding jury trial in the Constitution as originally adopted was, as is well known, a principal basis for objection in the state ratification debates. We have been cited to nothing in these or in the legislative history of the Seventh Amendment to indicate that the true believers in jury trial had given any thought to the problem here at issue.