**MATIMAK TRADING CO.,**
**Plaintiff–Appellant,**

v.

**Albert KHALILY, d/b/a Unitex Mills,**
**Inc., and D.A.Y. Kids Sportswear**
**Inc., Defendants–Appellees.**

**No. 1251, Docket 96–9117.**

United States Court of Appeals,
Second Circuit.

Argued April 22, 1997.

Decided June 27, 1997.

Thomas A. Leghorn, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, for Plaintiff–Appellant.

M. Christine Carty, Schnader, Harrison Segal & Lewis, New York City, for Defendants–Appellee D.A.Y. Kids Sportswear.

Frank W. Hunger, Mary Jo White, Michael Jay Singer, John P. Schnitker, United States Department of Justice, for the United States Department of Justice as Amicus Curiae.

Before: ALTIMARI, McLAUGHLIN and JACOBS, Circuit Judges.

McLAUGHLIN, Circuit Judge.

■ Plaintiff appeals from an order entered August 19, 1996 in the United States District Court for the Southern District of New York (Wood, *J.*) dismissing plaintiff's claims for lack of subject matter jurisdiction. We review *de novo* the grant of the dismissal motion. *See PaineWebber Inc. v. Bybyk,* 81 F.3d 1193, 1197 (2d Cir.1996).

The principal issue is whether a Hong Kong corporation is either a "citizen or subject" of a "foreign state" for purposes of alienage jurisdiction. *See* U.S. Const. art. III, § 2, cl. 1; 28 U.S.C. § 1332(a)(2). More precisely the issue is whether Hong Kong may be regarded as a "foreign state." We hold that it may not and, accordingly, affirm the district court.

## BACKGROUND

Plaintiff Matimak Trading Co. Ltd. is a corporation organized under the laws of Hong Kong, with its principal place of business in Hong Kong. It seeks to sue Albert Khalily and D.A.Y. Kids Sportswear Inc., two New York corporations, in the Southern District of New York (Wood, *J.*) for breach of contract. Matimak invoked the court's diversity jurisdiction under 28 U.S.C. § 1332(a)(2), which provides jurisdiction over any civil action arising between "citizens of a State and citizens or subjects of a foreign state."

In June 1996, the district court *sua sponte* raised the issue of the court's subject matter jurisdiction. In August 1996, after allowing the parties to brief the issue, the district court dismissed the Complaint for lack of subject matter jurisdiction. The court concluded that Hong Kong is not a "foreign state" under the diversity statute, and, conse-

quently, Matimak is not a "citizen or subject" of a "foreign state."

## DISCUSSION

This is not the first time we have had to navigate what we have earlier described as a "shoal strewn area of the law." *National Petrochemical Co. of Iran v. M/T Stolt Sheaf,* 860 F.2d 551, 552 (2d Cir.1988).

Article III of the Constitution extends the federal judicial power to "all Cases ... between a State, or citizens thereof, and foreign States, Citizens or Subjects." U.S. Const. art. III, § 2, cl. 1. The United States Judicial Code tracks the constitutional language by providing diversity jurisdiction over any civil action arising between "citizens of a State and citizens or subjects of a foreign state." 28 U.S.C. § 1332(a)(2). This judicial power is referred to as "alienage jurisdiction." *Iran Handicraft and Carpet Export Ctr. v. Marjan Int'l Corp.,* 655 F.Supp. 1275, 1277 (S.D.N.Y.1987), *aff'd,* 868 F.2d 1267 (2d Cir.1988).

■ British sovereignty over Hong Kong ceases on July 1, 1997, when Hong Kong becomes a special administrative region of the People's Republic of China. *See* 22 U.S.C. § 5701(1)(B) (West Supp.1996). Diversity of citizenship, however, is determined as of the commencement of an action. *See Louisville, N.A. & C. Ry. Co. v. Louisville Trust Co.,* 174 U.S. 552, 566, 19 S.Ct. 817, 822, 43 L.Ed. 1081 (1899); *Smith v. Sperling,* 354 U.S. 91, 93 n. 1, 77 S.Ct. 1112, 1113 n. 1, 1 L.Ed.2d 1205 (1957); *Maryland Cas. Co. v. W.R. Grace and Co.,* 23 F.3d 617, 622 (2d Cir.1993).

Given these building blocks, we must address three principal questions: (1) whether Hong Kong is a "foreign state," such that Matimak is a "citizen or subject" of a "foreign state"; (2) whether Matimak is a "citizen or subject" of the United Kingdom, by virtue of Hong Kong's relationship with the United Kingdom when it brought suit; and (3) whether any and all non-citizens of the United States may *ipso facto* invoke alienage jurisdiction against a United States citizen. Although not addressed by the parties, this last question is the focus of the dissent, and thus merits serious consideration.

## I. Is Hong Kong a "Foreign State"?

### A. Well–Established Principles in this Court

Neither the Constitution nor § 1332(a)(2) defines "foreign state." However, "[i]t has generally been held that a foreign state is one formally recognized by the executive branch of the United States government." 13B C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3604 (1984).

■ For purposes of diversity jurisdiction, a corporation is a "citizen" or "subject" of the entity under whose sovereignty it is created. *See National Steamship Co. v. Tugman,* 106 U.S. 118, 121, 1 S.Ct. 58, 59, 27 L.Ed. 87 (1882); *Restatement (Second) of the Foreign Relations Law of the United States* § 26 (1965).

The Supreme Court has never addressed the issue before us. This Court, however, has applied these general rules in addressing alienage jurisdiction on several occasions.

In *Iran Handicraft and Carpet Export Center v. Marjan International Corp.,* 655 F.Supp. 1275 (S.D.N.Y.), *aff'd,* 868 F.2d 1267 (2d Cir.1988), an Iranian corporation sued a New York corporation in the Southern District of New York for breach of contract. When the complaint was filed, Iran was undergoing a revolutionary change of government. The issue was whether the court was required to find that the United States formally recognized the new government of Iran to permit the plaintiff to invoke alienage jurisdiction. *See id.* at 1275–76.

The court noted the general rule that a "foreign state" in § 1332(a)(2) is one "formally recognized by the executive branch." *Id.* at 1277 (citing Wright, Miller & Cooper, *supra,* § 3604). The court explained:

> Because the Constitution empowers only the President to "receive Ambassadors and other public Ministers," the courts have deferred to the executive branch when determining what entities shall be considered foreign states. The recognition of foreign states and of foreign governments, therefore, is wholly a prerogative of the executive branch. Thus, it is outside the competence of the judiciary to pass judgment upon executive branch decisions regarding recognition.

*Id.* (citations omitted).

The court surveyed the case law, concluding that "[i]n cases involving parties claiming to be citizens of a foreign state, . . . courts have focused on whether the foreign state was recognized by the United States as 'a free and independent sovereign.'" *Id.* at 1278 (quoting *Windert Watch Co. v. Remex Elecs. Ltd.,* 468 F.Supp. 1242, 1244 (S.D.N.Y. 1979)). This description is consistent with the accepted definition of a "state" in international law, which requires that the entity have a "'defined territory'" and be "'under the control of its own government.'" *National Petrochemical Co. of Iran v. M/T Stolt Sheaf,* 860 F.2d 551, 553 (2d Cir.1988) (quoting *Restatement (Third) of the Foreign Relations Law of the United States* § 201 (1987)). Relying on the State Department's clarification of Iran's diplomatic status, the *Iran Handicraft* court concluded that "it is beyond doubt that the United States continues to recognize Iran as an independent sovereign nation." 655 F.Supp. at 1280 & n. 4.

The parties here agree that the United States has not formally recognized Hong Kong as a foreign state. Invoking the jurisprudence of this Court and others, however, Matimak contends that Hong Kong has received "de facto" recognition as a foreign state by the United States, and thus its citizens may invoke alienage jurisdiction. Matimak points to the United States' diplomatic and economic ties with Hong Kong as evidence of this recognition.

This Court established the doctrine of *de facto* recognition in *Murarka v. Bachrack Brothers, Inc.,* 215 F.2d 547 (2d Cir.1954). In that case a partnership doing business in New Delhi, India sued a New York corporation. The court ruled that it had alienage jurisdiction despite the fact that the complaint was filed thirty days before the United States formally recognized India as a foreign state. The court explained:

> True, as of July 14, 1947 our Government had not yet given India *de jure* recognition, but its exchange of ambassadors in February and April 1947 certainly amounted at least to *de facto* recognition, if not more. To all intents and purposes, these acts constituted a full recognition of the Interim Government of India at a time when India's ties with Great Britain were in the process of withering away, which was followed a month later, when partition took place between India and Pakistan, by the final severance of India's status as a part of the British Empire. . . . Unless form rather than substance is to govern, we think that in every substantial sense by the time this complaint was filed India had become an independent international entity and was so recognized by the United States.

*Id.* at 552 (citation omitted).

This analysis might reasonably be regarded as nothing more than an acknowledgment of the United States' imminent formal recognition of a sovereign state. The analogy of Hong Kong to India is inapt. India, which had been a colony of Great Britain, was about to become an independent sovereign nation. Not so for Hong Kong, which is about to be absorbed into China.[1]

Matimak, of course, argues for a more flexible interpretation of the *de facto* test. At the very least, however, as *Iran Handicraft* noted, the *de facto* test depends heavily on whether the Executive Branch regards the entity as an "independent sovereign nation." 655 F.Supp. at 1278. It is beyond cavil that "[w]ho is the sovereign, *de jure* or *de facto*, of a territory, is not a judicial, but a political, question, the determination of which by the legislative and executive departments of any government conclusively binds the judges, as well as all other officers, citizens, and subjects of that government." *Jones v. United States,* 137 U.S. 202, 212, 11 S.Ct. 80, 83, 34 L.Ed. 691 (1890); *see Vermilya–Brown Co. v. Connell,* 335 U.S. 377, 380, 69 S.Ct. 140, 142, 93 L.Ed. 76

---

1. We express no view as to Hong Kong's current status, following Great Britain's transfer of sovereignty on July 1, 1997. As noted above, diversity of citizenship is determined as of the commencement of an action. Accordingly, we need not determine the status of Hong Kong, its residents, or its corporations under Chinese rule for purposes of alienage jurisdiction.

(1948); *United States ex rel. D'Esquiva v. Uhl*, 137 F.2d 903, 906 (2d Cir.1943).

The deference to the Executive Branch exhibited in *Iran Handicraft* and *Murarka* was similarly crucial in *Calderone v. Naviera Vacuba S/A*, 325 F.2d 76 (2d Cir.1963), *modified on other grounds*, 328 F.2d 578 (2d Cir.1964) (per curiam), where we sustained alienage jurisdiction in a suit between a Cuban corporation and an American company. The court explained:

> Considerations of both international relations and judicial administration lead us to conclude that the onus is on the Department of State, or some other department of the Executive Branch, to bring to the attention of the courts its decision that permitting nationalized Cuban corporations to sue is contrary to the national interest. Since silence on the question may be highly desirable, it would not be wise for the court unnecessarily to force the Government's hand. However, in this case we need not merely rely on the maintenance of the *status quo*, because the Executive Branch has made its wishes known.... [T]he Department of Justice has urged that nationalized Cuban corporations have access to our courts with the protection of the act of state doctrine.

*Id.* at 77.

Courts have consistently required such deference for purposes of alienage jurisdiction. *See, e.g., Abu–Zeineh v. Federal Labs., Inc.*, No. 91–2148, at 3–5 (W.D.Pa. Dec. 7, 1994) (holding that Palestine is not a foreign state for purposes of alienage jurisdiction, as Palestine had not been recognized by the United States as an independent, sovereign nation); *Bank of Hawaii v. Balos*, 701 F.Supp. 744, 746–47 (D.Haw.1988) (holding that the Republic of the Marshall Islands ("RMI") is a foreign state for purpose of alienage jurisdiction, relying on the fact that "[b]oth the Congress and the President have indicated that the RMI is henceforth to be treated as an independent sovereign"); *St. Germain v. West Bay Leasing, Ltd.*, No. 81–CV–3945, at 4–5 (E.D.N.Y. Sept. 30, 1982) (holding that a Cayman Islands corporation may not invoke alienage jurisdiction, finding that the United States does not recognize the Cayman Islands as an independent sovereign); *Chang v. Northwestern Mem'l Hosp.*, 506 F.Supp. 975, 978 (N.D.Ill.1980) (holding that Taiwan is a foreign state for purposes of alienage jurisdiction, relying on a letter from a representative from the State Department confirming that Taiwanese citizens could sue in federal court); *Klausner v. Levy*, 83 F.Supp. 599, 600 (E.D.Va.1949) (holding that Palestine is not a foreign state for purposes of alienage jurisdiction, as Palestine had not been recognized by the United States as an independent, sovereign nation); *Betancourt v. Mutual Reserve Fund Life Ass'n*, 101 F. 305, 306 (C.C.S.D.N.Y.1900) (holding that Cuba is a foreign state for purposes of alienage jurisdiction, noting that the United States had recognized Cuba as "free and independent").

When Matimak brought this suit in August 1995, Hong Kong was a "British Dependent Territory," British Nationality Act 1981, Sched. 6, and was ruled by a governor appointed by the United Kingdom. As such, it maintained some independence in its international economic and diplomatic relationships, but in matters of defense and foreign affairs remained dependent on the United Kingdom.

Hong Kong is the United States' twelfth-largest trading partner, with direct United States financial investment of almost twelve billion dollars. *See* Letter from Jim Hergen, Assistant Legal Advisor for East Asian and Pacific Affairs, United States Department of State, to Marshall T. Potashner, Attorney for Matimak, of 6/21/96, at 3. Hong Kong's relationship with the United States was most recently manifested in the United States–Hong Kong Policy Act of 1992, 22 U.S.C. §§ 5701–32 (West Supp.1996), which makes clear that Congress desires United States–Hong Kong relations to continue after July 1, 1997, when Hong Kong becomes a special administrative region of China. The Act states that "Hong Kong plays an important role in today's regional and world economy. This role is reflected in strong economic, cultural, and other ties with the United States that give the United States a strong interest in the continued vitality, prosperity, and stability of Hong Kong." *Id.* § 5701(4).

The Policy Act makes equally clear, however, that the United States does not regard Hong Kong as an independent, sovereign political entity. The Act provides that Hong Kong "will continue to enjoy a high degree of autonomy on all matters other than defense and foreign affairs," *id.* § 5701(1)(B), and emphasizes that only "with respect to economic and trade matters" shall the United States "continue to treat Hong Kong as a territory which is fully autonomous from the United Kingdom," *id.* § 5713(3). The Act points to the need to safeguard human rights during the "transition in the exercise of sovereignty over Hong Kong." *Id.* § 5701(6).

The United States has embraced the same position on this appeal. Having originally stated that "Hong Kong should ... be treated in the courts of the United States as a *de facto* 'foreign state' " for purposes of alienage jurisdiction, Letter from Hergen to Potashner, *supra*, at 2, the United States reversed course. In its *amicus* brief, the Justice Department notes that "[t]he State Department no longer urges treatment of Hong Kong as a *de facto* foreign state and withdraws any reliance on this contention." [2]

Although we need not resolve this issue here, we note that the State Department's unexplained change in stance following the district court's opinion might under different circumstances require further inquiry into its ulterior motives. *Cf. National Petrochemical,* 860 F.2d at 555–56 (court might boggle at *"ad hoc, pro hac vice"* directive of the government). No reason is apparent, and none is suggested, for refusing to defer to the State Department in this case.

The State Department's stance on appeal confirms what is already clear from the United States' dealings with Hong Kong, as evidenced in the Policy Act: it did not regard Hong Kong as an independent sovereign entity. *Cf. id.* (considering evidence "in the aggregate" and concluding that there is "no indication" that the government's statement of interest was "an arbitrary or *ad hoc* directive.").

■ For these reasons, it is clear that the United States did not recognize Hong Kong as a sovereign and independent international entity. *Cf. id.* (considering "in the aggregate" the evidence of whether the United States intended to allow the Iranian government to bring suit in diversity). Accordingly, consistent with this Court's precedent, Matimak cannot invoke alienage jurisdiction as a "citizen or subject" of Hong Kong.

Nevertheless, Matimak and the dissent question these precedents. We must address their concerns.

### B. Deference to the Executive Branch: Sound Precedent

■ There are at least two compelling reasons for this Court to continue to defer to the Executive Branch in defining a "foreign state" for purposes of alienage jurisdiction: such deference is consistent with (1) the purposes of alienage jurisdiction and (2) the well-established analysis for defining a "foreign state" in related jurisdictional statutes and constitutional provisions.

### 1. Rationales Underlying Alienage Jurisdiction

■ The raison d'être of alienage jurisdiction is to avoid "entanglements with other sovereigns that might ensue from failure to treat the legal controversies of aliens on a national level." *Iran Handicraft,* 655 F.Supp. at 1277 (citations omitted); *see Sadat v. Mertes,* 615 F.2d 1176, 1186 (7th Cir. 1980) (noting that the "paramount purpose" of the alienage jurisdiction provision to is avoid offense to foreign nations because of the possible appearance of injustice to their citizens); *Van Der Schelling v. U.S. News & World Report,* 213 F.Supp. 756, 758–61 (E.D.Pa.) (noting the drafters' emphasis on preserving peace with foreign nations, the inability of a prince or sovereign of a country

**2.** The Justice Department chose to inform the Court of this crucial fact in a footnote. This Court frowns on raising such important points in footnotes, either before the district court or on appeal. "The enormous volume of briefs and arguments pressed on each panel of this court at

every sitting precludes our scouring through footnotes in search of some possibly meritorious point that counsel did not consider of sufficient importance to include as part of the argument." *United States v. Restrepo,* 986 F.2d 1462, 1463 (2d Cir.1993).

to redress prejudice against one of his citizens or subjects in our courts, and their conviction that such prejudice amounts to aggression upon the sovereign), *aff'd,* 324 F.2d 956 (3d Cir.1963); *Blair Holdings Corp. v. Rubinstein,* 133 F.Supp. 496, 500 (S.D.N.Y.1955) (noting the "[a]pprehension of entanglements with other sovereigns that might ensue from failure to treat the legal controversies of aliens on a national level"); Kevin R. Johnson, "Why Alienage Jurisdiction? Historical Foundations and Modern Justifications for Federal Jurisdiction over Disputes Involving Noncitizens," 21 Yale J. Int'l L. 1, 10–16 (1996). These "entanglements" range from war to negative commercial impacts. *See* Johnson, *supra,* at 11–14, 20.

A secondary rationale is historical. "Several states had failed to give foreigners proper protection under the treaties concluded with England at the end of the Revolution." Henry J. Friendly, "The Historic Basis of Diversity Jurisdiction," 41 Harv. L.Rev. 483, 484 n. 6 (1927–28); *see also Sadat,* 615 F.2d at 1182; *Blair Holdings,* 133 F.Supp. at 500. "Local animosity was so great that only national tribunals could compel the enforcement of a national treaty." Friendly, 41 Harv. L.Rev. at 484 n. 6. The drafters' concern with the failure of individual states to protect foreigners under treaties is intertwined with their intent "to provide the federal courts with a form of protective jurisdiction over matters implicating international relations where the national interest was paramount." *Sadat,* 615 F.2d at 1182.

These rationales command deference to the Executive Branch's recognition of a foreign entity. Where the Executive Branch determines that a foreign entity is not a "sovereign," there is no threat of entanglement with a sovereign stemming from the refusal of a federal court to treat that entity's citizen in a national forum. To be sure, if an unrecognized foreign entity perceives that its citizens have been subject to bias in a state court, there may be foreign-relations repercussions. Indeed, the dissent seems particularly concerned with potential economic—and even legal—repercussions in the instant case. It is clearly the bailiwick of the Executive Branch, however, to evaluate the autonomy and resources of a foreign entity in evaluating whether the entity constitutes a sovereign and independent state; it is for the Executive Branch, not the courts, to anticipate where potential "entanglements" with such entities are appreciable enough to recognize sovereign status.

### 2. *Definition of "Foreign State" in Related Jurisdictional Statutes*

Deference to the Executive Branch for purposes of alienage jurisdiction is further warranted in light of the well-established jurisprudence surrounding the notion of "foreign state" in other jurisdictional statutes. *See* 28 U.S.C. §§ 1330(a), 1332(a)(2), 1332(a)(4), and 1441(d).

■ The same terms used in the same statute should get the same meaning. *See Bankamerica Corp. v. United States,* 462 U.S. 122, 129, 103 S.Ct. 2266, 2270, 76 L.Ed.2d 456 (1983); *Mohasco Corp. v. Silver,* 447 U.S. 807, 826, 100 S.Ct. 2486, 2497, 65 L.Ed.2d 532 (1980).

Section 1332(a)(4) and the current § 1332(a)(2), of course, were not originally drafted together. In 1976, having revised § 1332(a)(2), Congress added § 1332(a)(4) to provide for diversity jurisdiction in suits brought by foreign states against a United States citizen. Congress chose to define the term "foreign state" in the new § 1332(a)(4) by reference to 28 U.S.C. § 1603(a). Wright, Miller & Cooper, *supra,* § 3604. Section 1603 uses the term "foreign state" repeatedly, but never defines it. *See Morgan Guar. Trust Co. of N.Y. v. Republic of Palau,* 924 F.2d 1237, 1243 (2d Cir.1991) (Section 1603 "is more descriptive than definitional"). That Congress did not at the same time define "foreign state" in § 1332(a)(2) by a similar reference to § 1603(a) suggests only that "foreign state" in § 1332(a)(2) does not include § 1603(a)'s inclusion of certain instrumentalities, political subdivisions and other state entities as a "foreign state." *See Windert,* 468 F.Supp. at 1246; *Ruggiero v. Compania Peruana de Vapores "Inca Capac Yupanqui",* 639 F.2d 872, 875 n. 6 (2d Cir.1981). It does not suggest that "foreign state," as

undefined in § 1603 or § 1332(a)(2), should get different meanings.

■ This Court has ruled that, for purposes of § 1332(a)(4), a foreign state and the government that represents it must be one "'recognized'" by the United States. *National Petrochemical,* 860 F.2d at 553 (citing *Pfizer Inc. v. India,* 434 U.S. 308, 319–20, 98 S.Ct. 584, 591–92, 54 L.Ed.2d 563 (1978)). This holding reflects the well-established jurisprudence of the Supreme Court. *See Pfizer,* 434 U.S. at 319–20, 98 S.Ct. at 591–92; *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 410–12, 84 S.Ct. 923, 930–32, 11 L.Ed.2d 804 (1964); *National City Bank of N.Y. v. Republic of China,* 348 U.S. 356, 358, 75 S.Ct. 423, 425, 99 L.Ed. 389 (1955); *Guaranty Trust Co. of N.Y. v. United States,* 304 U.S. 126, 137, 58 S.Ct. 785, 791, 82 L.Ed. 1224 (1938); *Jones v. United States,* 137 U.S. 202, 212, 11 S.Ct. 80, 83, 34 L.Ed. 691 (1890); *see also Land Oberoesterreich v. Gude,* 109 F.2d 635, 637 (2d Cir.1940).[3]

The similar rationales underlying § 1332(a)(2) and § 1332(a)(4) should compel a similar definition of "foreign state." The courts must respect the role of the Executive Branch in foreign affairs, both by acknowledging its evaluation of a foreign entity's sovereignty, and thus international standing, and by respecting its determination as to whether a foreign entity or its government should be permitted to sue in our courts. *See generally Banco Nacional,* 376 U.S. at 410, 84 S.Ct. at 930.

According the same core meaning to "foreign state" in both sections of the statute in which it occurs, we defer to the Executive Branch for purposes of § 1332(a)(2).

### C. *Other Jurisprudence*

We are not unaware that several district courts have concluded that Hong Kong is a "foreign state" for purposes of alienage jurisdiction. The district courts that have done

this have done so cursorily and without benefit of briefing from the parties, *see Timco Eng'g, Inc. v. Rex & Co.,* 603 F.Supp. 925, 930 n. 8 (E.D.Pa.1985); without any analysis, *see Refco, Inc. v. Troika Inv. Ltd.,* 702 F.Supp. 684, 685 n. 2 (N.D.Ill.1988); or without considering the stance of the Executive Branch, *see Creative Distribs., Ltd. v. Sari Niketan, Inc.,* No. 89 C 3614, 1989 WL 105210, at *2 (N.D.Ill. Sept.1, 1989). These cases are uniformly unpersuasive and should be contrasted with the two Southern District of New York decisions that have addressed this issue in more detail.

In *Windert Watch Co. v. Remex Electronics Ltd.,* 468 F.Supp. 1242, 1245 (S.D.N.Y. 1979), the court held that Hong Kong was not a "foreign state" under § 1332(a)(2). The court reasoned that Hong Kong was a "Crown Colony of the United Kingdom," and was administered by a Governor appointed by the Queen and serving as her representative. *Id.* The court further noted that a communication sent from a representative of the State Department "confirms that the United States does not recognize Hong Kong as an independent state but rather regards it as a colony of the United Kingdom." *Id.* Finally, the court noted that "[t]he United States carries on no direct diplomatic dealings with Hong Kong." *Id.*

In *Tetra Finance (HK) Ltd. v. Shaheen,* 584 F.Supp. 847 (S.D.N.Y.1984), on the other hand, the court in dicta opined that a Hong Kong corporation should be entitled to invoke alienage jurisdiction. The court believed that "[i]t would seem hypertechnical to preclude Hong Kong corporations from asserting claims in our courts simply because Hong Kong has not been formally recognized by the United States as a sovereign in its own right." *Id.* at 848. The court explained that "[t]he commercial and cultural realities of the modern world dictate that diversity jurisdiction should be granted to certain gov-

---

3. There is thus a slight distinction between the definition of "foreign state" in these sections. *See Iran Handicraft,* 655 F.Supp. at 1277–78. In contrast to § 1332(a)(4), under § 1332(a)(2), "[o]nce the United States recognizes an entity as a sovereign state, ... a subsequent withdrawal of recognition of that state's government does not

effect a change in the underlying recognition of the state as an international juridical entity." *Id.* at 1281. The concern under § 1332(a)(4) with whether a government represents the people of a foreign state is irrelevant in determining whether the foreign state is sovereign and independent. *See id.*

ernmental entities that have not been formally recognized." *Id.* (citation omitted).

Only the *Windert* decision conscientiously applied the standards outlined in *Murarka* (the *Tetra* court did not cite *Murarka* ), specifically relying on the stance of the State Department in determining whether the United States had recognized Hong Kong as a foreign state. The *Tetra* court, in contrast, focused exclusively on the United States' economic relationship with Hong Kong, an analysis clearly inconsistent with *Murarka, Calderone* and this Court's affirmance in *Iran Handicraft.* In short, neither *Tetra* nor the other cases conferring alienage jurisdiction on Hong Kong corporations present compelling arguments.

In *Netherlands Shipmortgage Corp. v. Madias,* 717 F.2d 731, 735 (2d Cir.1983), the court concluded that a Bermuda corporation properly invoked diversity jurisdiction in a suit against a New York partnership. *Netherlands,* however, is unenlightening. It is unclear on what basis the court exercised jurisdiction—that is, whether Bermuda was a "foreign state" and its corporations were "citizens or subjects" thereof, or whether Bermuda corporations were "citizens or subjects" of the United Kingdom. The issues now pressed upon us were obviously not the *Netherlands* court's concern.

Finally, as the dissent notes, in *Wilson v. Humphreys (Cayman) Ltd.,* 916 F.2d 1239 (7th Cir.1989), the court concluded that diversity jurisdiction was proper between a United States citizen and a Cayman Islands corporation. The court failed, however, even to consider whether the United States recognized the Cayman Islands as a foreign state, *see id.* at 1242–43 & n. 5, and is thus clearly inconsistent with this Court's precedent, *see supra* Part I.

## II. Is Matimak a "Citizen or Subject" of the United Kingdom?

■ Well-established principles—both in this Circuit and elsewhere—furnish the analytical scaffolding for determining whether Matimak is a citizen or subject of the United Kingdom. There is no question, of course, that the United States formally recognizes the United Kingdom as a sovereign international entity.

■ We begin with the truism that a foreign state is entitled to define who are its citizens or subjects. *United States v. Wong Kim Ark,* 169 U.S. 649, 668, 18 S.Ct. 456, 464, 42 L.Ed. 890 (1898) ("Nor can it be doubted that it is the inherent right of every independent nation to determine for itself, and according to its own constitution and laws, what classes of persons shall be entitled to its citizenship."); *Ruggiero v. Compania Peruana de Vapores "Inca Capac Yupanqui",* 639 F.2d 872, 875 (2d Cir.1981); *Murarka v. Bachrack Bros. Inc.,* 215 F.2d 547, 551–53 (2d Cir.1954); 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction 2d* §§ 3604 & 3611 (1984).

It is another accepted precept that a corporation, for purposes of diversity jurisdiction, is a "citizen" or "subject" of the entity under whose sovereignty it is created. *See supra* Part I.A.

■ In § 1332(a)(2) the terms "citizen" and "subject" do not connote a different "degree of attachment or allegiance to a foreign state." 1 James Wm. Moore et al., *Moore's Federal Practice* ¶ 0.75 (3d ed.1996); *United States v. Wong Kim Ark,* 169 U.S. 649, 663–664, 18 S.Ct. 456, 462–463, 42 L.Ed. 890 (1898) ("The term 'citizen,' as understood in our law, is precisely analogous to the term 'subject' in the common law, and the change of phrase has entirely resulted from the change of government."). Rather, the terms are meant to encompass persons living under distinct forms of government: "A monarchy has subjects; a republic has citizens." Moore, *supra,* ¶ 0.75.

The parties quarrel over the significance of the British Nationality Act 1981, which delineates British citizenship in detail. The Act fails to support Matimak's assertion that a Hong Kong corporation is a citizen of the United Kingdom. The Act applies only to natural persons, not corporations. The more relevant provision of British law squarely specifies that "the privileges of British nationality are not conferred on corporations formed under the laws of Hong Kong." *Win-*

*dert Watch Co. v. Remex Elecs. Ltd.*, 468 F.Supp. 1242, 1246 (S.D.N.Y.1979) (citing British Companies Act 1948 § 406).

At any rate, the British Nationality Act clearly distinguishes between citizens of the United Kingdom and citizens of "British Dependent Territories," who must first undergo a citizenship application procedure and fulfill certain residency requirements in the United Kingdom proper before earning British citizenship. *See* British Nationality Act 1981 § 4(1)(2).

The Justice Department, as *amicus,* argues that as a Hong Kong corporation, Matimak is governed by the Hong Kong Companies Ordinance, which is modelled on the British Companies Act 1948. The Justice Department concludes that because the ultimate sovereign authority over the plaintiff is the British Crown, Matimak should be treated as a subject of United Kingdom sovereignty for purposes of § 1332. Hong Kong corporations, however, are no more "subjects" than "citizens." *See* Moore, *supra,* ¶ 0.75.

The fact that the Hong Kong Companies Ordinance may be "ultimately traceable" to the British Crown is too attenuated a connection. Matimak was incorporated under Hong Kong law, the Companies Ordinance 1984 of Hong Kong, and is entitled to the protections of Hong Kong law only. *Cf. Cedec Trading Ltd. v. United Am. Coal Sales, Inc.,* 556 F.Supp. 722, 723–24 & n. 2 (S.D.N.Y.1983) (holding that corporations of the Channel Islands, a province which is part of the United Kingdom proper, governed by British law, and whose foreign affairs are entirely controlled by the United Kingdom, is a citizen or subject of the United Kingdom); *Compare St. Germain v. West Bay Leasing, Ltd.,* No. 81–CV–3945, at 6 (E.D.N.Y. Sep. 30, 1982) (holding that a corporation of the Cayman Islands, whose corporate law is clearly independent from the United Kingdom's, is not a citizen or subject of the United Kingdom). ▮▮▮ Matimak is not a "citizen or subject" of a foreign state. It is thus stateless. And a stateless person—the proverbial man without a country—cannot sue a United States citizen under alienage jurisdiction. *Kantor v. Wellesley Galleries, Ltd.,* 704 F.2d

1088, 1092 (9th Cir.1983); *Sadat v. Mertes,* 615 F.2d 1176, 1183 (7th Cir.1980); *Standing Rock Sioux Indian Tribe v. Dorgan,* 505 F.2d 1135, 1140 (8th Cir.1974); *Shoemaker v. Malaxa,* 241 F.2d 129, 129 (2d Cir.1957) (per curiam); *see also Ligi v. Regnery Gateway, Inc.,* 689 F.Supp. 159, 160 n. 2 (E.D.N.Y. 1988); *RCA Records v. Hanks,* 548 F.Supp. 979, 982 (S.D.N.Y.1982).

III. *Does "Citizen or Subject" in § 1332(a)(2) Describe Any and All Persons Who Are Not Citizens of the United States?*

It has recently been suggested that the Founding Fathers intended to confer alienage jurisdiction over suits between a United States citizen and any other person in the world who is not a United States citizen. *See* Christine Biancheria, "Restoring the Right to Have Rights: Statelessness and Alienage Jurisdiction in Light of *Abu–Zeineh v. Federal Laboratories, Inc.,*" 11 Am. U.J. Int'l L. & Pol'y 195 (1996)". The dissent makes the same argument, substantially adopting the analysis set forth in this commentary and arguing that the Judiciary Act, prior to its amendment in 1875, evidenced the intent of the drafters.

Even beyond its obvious rejection of well-established precedent, this argument is flawed in several respects.

One of the earliest significant Supreme Court cases emphasized that the Judiciary Act is subordinate to the Constitution. *See Mossman v. Higginson,* 4 U.S. (4 Dall.) 12, 14, 1 L.Ed. 720 (1800) ("[T]he judiciary act can, and must, receive a construction consistent with the Constitution."); *Hodgson v. Bowerbank,* 9 U.S. (5 Cranch) 303, 303, 3 L.Ed. 108 (1809) ("[T]he statute cannot extend the jurisdiction beyond the limits of the Constitution."). The language of the Act must therefore be considered, at best, as the equivalent of and no more than the Constitution's description of alienage jurisdiction. It may be noted in passing that the portion of the pre–1875 Judiciary Act on which the dissent relies is notorious as poorly drafted. *See* Dennis J. Mahoney, "A Historical Note

on *Hodgson v. Bowerbank*," 49 U. Chi. L.Rev. 725, 732–33 (1982).

▮ In our analysis of what was intended by the relevant words of the Judiciary Act and Constitution, we start with the plain language. *See Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 557–58, 110 S.Ct. 2126, 2130–31, 109 L.Ed.2d 588 (1990); *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685, 105 S.Ct. 2297, 2301, 85 L.Ed.2d 692 (1985). The diversity statute must be strictly construed. *See Romanella v. Hayward*, 114 F.3d 15, 16 (2d Cir.1997) (citing *Healy v. Ratta*, 292 U.S. 263, 270, 54 S.Ct. 700, 703, 78 L.Ed. 1248 (1934)). The dissent seems to agree that the plain language does not support its approach. *See* Biancheria, *supra*, at 208.

▮ True, this plain language may be overcome if there is "a clearly expressed legislative intention [to the] contrary." *Toibb v. Radloff*, 501 U.S. 157, 162, 111 S.Ct. 2197, 2200, 115 L.Ed.2d 145 (1991); *see Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). The legislative history here, however, fails to meet that standard.

During the Constitutional Convention of 1787, the drafters of the Constitution used the phrase "citizen or subject of a foreign state" as frequently as "alien" or "foreigner." *See* Kevin R. Johnson, "Why Alienage Jurisdiction? Historical Foundations and Modern Justifications for Federal Jurisdiction over Disputes involving Noncitizens," 21 Yale J. Int'l L. 1, 1–20 (1996). As the dissent stresses, a basic assumption of the drafters was that anyone who was not a citizen of the United States must by definition have been subject to the power of a foreign government or sovereign. The "idea of statelessness" was simply not in their "contemplation." *See Houghton Mifflin Co. v. Stackpole Sons, Inc.*, 104 F.2d 306, 309–10 (2d Cir.1939) ("[T]he problem of statelessness has only become acute of late years, but it promises to become increasingly more difficult as time goes on."); *Blair Holdings*, 133 F.Supp. at 501 (noting that "problems associated with that status [statelessness] are of recent vintage"); Biancheria, *supra*, at 210 (same).

The basic assumption of the framers—if indeed it was ever valid—no longer holds true: not every "foreigner" is a citizen or subject of some foreign state. As noted at the conclusion of Part II, *supra*, the notion of statelessness is now well embedded in international law. Accordingly, the dissent's conclusion that the drafters in the late-eighteenth century intended that all "foreigners," including stateless persons, be entitled to invoke alienage jurisdiction over a United States citizen ignores the fact that the term in 1787 did not include stateless persons—a category of people unknown to the drafters of the Constitution.

The dissent also appears to agree that the overriding rationale of alienage jurisdiction was to accord foreign citizens a neutral forum rather than a state court that might be perceived by a foreigner as biased in favor of its own citizens. This would avoid entanglements with foreign states and sovereigns. *See supra* Part I.B.1. According alienage jurisdiction to "stateless" persons does not serve this rationale: there is no danger of foreign entanglements, as there is no sovereign with whom the United State could be become entangled.

We should be hesitant, moreover, to hinge our analysis on the possibility that a foreign state might define who are its citizens or subjects based on discriminatory criteria. If a foreign state has determined that a person is not entitled to citizenship it should certainly be unconcerned with that person's treatment in a court in the United States. *Cf. Liakakos v. CIGNA Corp.*, 704 F.Supp. 583, 585 (E.D.Pa.1988) (noting that a foreign country would "ascribe little importance to one of its citizens who has become naturalized and resides in the United States"); *St. Germain v. West Bay Leasing, Ltd.*, No. 81–CV–3945, at 6 (E.D.N.Y. Sep. 30, 1982) (noting that where a country fails to grant full citizenship to citizens of its dependencies, "this country's concern over giving possible offense to a foreign state by proving only state courts as a forum must be correspondingly less").

▮ It might occasionally seem incongruous not to allow a stateless person to bring

suit in federal court; but this does not make it inconsistent with the idea of alienage jurisdiction. The drafters' worry that foreigners not suffer prejudice in state courts reflected their concern that such prejudice might harm foreign relations; avoiding prejudice to the individual foreigners themselves was not an independent concern. *See* Johnson, *supra,* at 20 ("The motivations of the Framers may have been more pragmatic than idealistic."). At any rate, stateless persons are not totally denied an American forum; they may choose to sue in a state court. *See Romanella,* 114 F.3d at 16; *Blair Holdings,* 133 F.Supp. at 501.

Further, the term "foreign state" should be accorded a similar meaning in the related jurisdictional statutes and constitutional provisions. *See supra* Part I.B.2. The dissent's approach creates the paradox that "foreign state" has a meaning in § 1332(a)(4) but no meaning in § 1332(a)(2).

Finally, the dissent and Matimak suggest that alienage jurisdiction would be proper if the Court recognized Hong Kong as a "political subdivision of a foreign state." They misconstrue the diversity statute. As noted above, *see supra* Part I.B.2., the definition of "foreign state" set out in 28 U.S.C. § 1603(a), which includes "political subdivisions," is inapplicable to § 1332(a)(2).

## CONCLUSION

Matimak is not a "citizen or subject of a foreign state," under 28 U.S.C. § 1332(a)(2), and there is no other basis for jurisdiction over Matimak's suit. The district court properly dismissed Matimak's suit for lack of subject matter jurisdiction. Accordingly, the order of the district court is affirmed.

ALTIMARI, Circuit Judge, dissenting:

In the waning days of the United Kingdom's sovereignty over Hong Kong, the majority's holding is a death knell for Hong Kong corporations seeking access to our federal courts under alienage jurisdiction. Because I believe the failure to recognize Hong Kong as a "foreign state" or as a "citizen or subject" of the United Kingdom—at this critical juncture—is contrary to the purposes of alienage jurisdiction—I respectfully dissent.

As Dorothy said in the Wizard of Oz: "if I ever go looking for my heart's desire ... I won't look any further than my own backyard." This applies with equal force when we consider the extent to which we will open federal courts to foreigners under alienage diversity jurisdiction. We need look no further than our own Constitution.

The basis for diversity jurisdiction stems from Article III of the Constitution, which extends judicial power, *inter alia,* to all cases "between a State, or the Citizens thereof, and foreign States, Citizens or Subjects." U.S. Const. art. III, § 2. The primary reason for diversity jurisdiction is to provide a neutral forum. Another compelling reason for establishing alienage jurisdiction is to avoid entanglements with foreign sovereigns. Providing a neutral federal forum avoids the appearance of injustice or grounds for resentment in the relations of the United States with other nations. *See Hong Kong Deposit and Guar. Co. Ltd. v. Hibdon,* 602 F.Supp. 1378, 1383 (S.D.N.Y.1985). Because the quintessence of alienage diversity jurisdiction is being challenged today, we risk antagonizing two world forces—the United Kingdom and China. The burgeoning global business community fosters economic interdependence and the United States cannot act without regard to the concerns of the rest of the world.

Despite the loss of Hong Kong, there are several remaining British Crown Colonies subject to direct control by the British Government.[1] Corporations in the colonies as well as other dependent territories are placed in jeopardy by the majority's holding. Currently, Great Britain opens its courts to foreign corporations. *See* 7(2) *Halsbury's Laws of England* ¶ 1786 (Lord Hailsham of St. Marylebone ed., 4th ed.1996) (referring to companies regulated by the Companies Act 1985 of Great Britain). Will this decision have an adverse effect resulting in changes to British law limiting American corporations' access to British courts?

---

1. Bermuda, St. Helena, Falkland Islands, British    Virgin Islands, Cayman Islands and Gibraltar.

When Congress implemented the Article III constitutional grant of authority with the Judiciary Act of 1789, it used the terms "foreigner" and "alien" instead of "subject" and "citizen." The use of such terms strongly suggests that the Framers intended to grant access to federal courts to all aliens involved in litigation with a United States citizen. Nearly one hundred years later, Congress amended the Act to conform to the language in the Constitution. However, nowhere is there an indication that such an amendment intended to limit jurisdiction. The terms "subject" and "citizen" were used to open our courts to all foreigners despite the government under which they lived (*e.g.* a monarchy has "subjects;" a republic has "citizens." 15 James Wm. Moore et. al., *Moore's Federal Practice* ¶ 102.74 (3d ed.1997)). A person with no affiliation is "stateless" and cannot avail himself of diversity jurisdiction. This is the result that would be achieved should we refuse to recognize Hong Kong as a "subject" or "citizen" of the United Kingdom.

The idea of statelessness was not in the contemplation of the Framers and it is likely that the Framers envisioned "citizens or subjects of foreign states" to be anyone who is not a United States citizen. This reasoning was corroborated in 1833 by Justice Story when he reviewed the jurisdictional provisions of the Constitution. He wrote: " '[t]he inquiry may here be made, who are to be deemed aliens entitled to sue in the courts of the United States? The general answer is, any person who is not a citizen of the United States.' " 11 Am. U.J. Int'l L. & Pol'y 195, 211 (quoting 2 Joseph Story, Commentaries on the Constitution of the United States § 1700 at 499 (Melville M. Bigelow ed., 5th ed. Boston, Little, Brown & Co. 1891)(1833); The Federalist No. 80, at 588–89 (Alexander Hamilton) (B. Wright ed., 1961)). Nevertheless, our jurisprudence has heretofore barred stateless persons from access to our federal courts. Today, the majority bars stateless corporations as well.

A stateless corporation is an oxymoron. In the United States, a corporation cannot be created without the imprimatur of the state. This is also true in Great Britain and Hong Kong. Under British law, companies incorporated in parts of the Commonwealth outside Great Britain, without establishing a place of business in Great Britain, are governed by the corporate legislation in force in the area of incorporation. *See* 7(2) *Halsbury's Laws of England* ¶ 1781. Similarly, under Hong Kong law, companies incorporated outside Hong Kong are considered "overseas companies." Companies Ordinance 1984 of Hong Kong § 332. However, the exclusion by British law of such companies was not intended to create a "stateless corporation." Indeed, the opposite is true. The Companies Act of 1985 ensures "a home" for companies by providing that corporate nationality be associated with the country in which it was registered. *See* 7(1) *Halsbury's Laws of England* ¶ 94. As a result of such concern, a Hong kong corporation, such as Matimak, is denied access to our federal courts under alienage diversity jurisdiction because it is not a British corporation. Is it thus so easy to disavow a person or a corporate entity?

In evaluating who are the citizens of another country, this Court has held "[i]t is the undoubted right of each country to determine who are its nationals, and . . . such a determination will usually be accepted by other nations." *Murarka v. Bachrack Bros. Inc.,* 215 F.2d 547, 553 (2d Cir.1954). However, it is time to reevaluate whether our courts should look to foreign laws to determine who are foreign citizens for purposes of United States' alienage diversity jurisdiction. We would not allow foreign law to grant privileges in the United States, why should we allow foreign law to deny privileges afforded under the Constitution? It is undisputed that the privileges of British nationality are not conferred on corporations formed under the laws of Hong Kong. However, two things are clear: (1) Great Britain did not enact the Companies Act of 1985 in contemplation that a Hong Kong corporation would be denied access to United States' federal courts; and (2) the United States is not concerned with disputes between two foreign persons or entities. We are concerned with the disputes between our citizens and the "citizens or subjects" of foreign states.

There is grave danger if access to our federal courts is determined by foreign law. If we grant or deny jurisdiction based on another country's definition of its citizenry, we may unintentionally promote discrimination against certain classes of people or entities. Here, British law states that a Hong Kong corporation is not a "citizen" of Great Britain. Therefore, diversity jurisdiction is denied. After reversion, the citizenry of China and the right of abode will be determined according to the Basic Law of the Hong Kong Special Administrative Region of the People's Republic of China and the Chinese Nationality Act. The complexity of these laws raises concern because they differentiate between ethnic and non-ethnic Chinese residents of Hong Kong leaving some to speculate whether they will become stateless. *See* Samantha B. Whitehouse, "Status of Residents of Hong Kong After July 1, 1997," 10 Geo. Immigr. L.J. 799 (1996); "Looking to the Future with Confidence," South China Morning Post, April 13, 1996 (1996 WL 3756051); Kewalram Sital, "Why the Ethnic Minorities Deserve Better Treatment," South China Morning Post, August 29, 1993. However, reversion gives a Hong Kong corporation no advantage. Under the Basic Law, laws previously in force in Hong Kong shall be maintained. *See* Article 8, Basic Law. Extending the same logic used to interpret citizenship under British law—a Hong Kong corporation will be governed by the Hong Kong Companies Ordinance of 1984 and not the Chinese Nationality Act which applies to natural persons. Therefore, a Hong Kong corporation will remain a citizen of Hong Kong after reversion and once again we sit on the horns of a dilemma. Unless we recognize Hong Kong as a limited purpose foreign state or as a political subdivision of China—alienage diversity jurisdiction will be denied.

The United States and the international community recognize Hong Kong as an autonomous force. Congress recognizes Hong Kong as a separate foreign state for the purposes of per-country numerical limitations under Section 202 of the Immigration and Naturalization Act. H.R.Rep. No. 101–723(I) at 196 (1990), *reprinted in* 1990 U.S.S.C.A.N. 6710. Hong Kong is: recognized as an autonomous entity in the economic and trade arena, *see* 22 U.S.C. § 5701 (1997)[2]; a contracting party to the General Agreement of Tariffs and Trade, *see id.* § 5712(3), and thereby accorded most favored nation status by the United States; considered a member country in the United States Information Agency educational exchange program, *see* H.R.Rep. No. 128(I), 104th Cong. § 2403 (1995); and a member of the Organization for Economic Cooperation and Development. Hong Kong is a founding member of the World Trade Organization and strongly supports an open multilateral trading system and is a member in its own right in several multilateral economic organizations including the Asia Pacific Economic Cooperation and the Asian Development Bank. With respect to the legislative arena and international conventions, Hong Kong has acceded to the Paris Convention on industrial property, the Berne copyright convention, and the Geneva and Paris Universal Copyright Conventions. *See* Department of State, 1995 and 1996 Country Reports on Economic Policy and Trade Practices (Hong Kong).

Eschewing such widespread recognition of Hong Kong as a limited purpose autonomous entity to justify alienage diversity jurisdiction, the majority also rejects the argument that a Hong Kong corporation may be recognized as a "citizen or subject" of the United Kingdom. Until reversion, Hong Kong remains a British Crown Colony. Hong Kong law is not merely traceable to Great Britain—it exists only through the Queen. The Governor of Hong Kong is appointed by the Queen. He is empowered by the Letters Patent to make laws (ordinances) for Hong Kong. However, all ordinances must be sent to England and should they be found to be defective, the Queen can disallow them.

**2.** Congress enacted the Hong Kong Policy Act of 1992 to give Hong Kong special status enabling it to maintain its autonomous role in: bi-lateral agreements with the United States; participation in multilateral organizations; economic and trade matters; transportation; cultural and educational exchanges; and the application of United States law. The United States will continue to treat Hong Kong as a distinct legal entity, separate and apart from China, in all areas in which China has agreed to grant such autonomy. *See* 22 U.S.C. § 5701 *et seq.*

Hong Kong is a part and parcel of the Commonwealth. In fact, in multilateral fora, such as the International Telecommunications Union or the International Labor Organization, Hong Kong participates as part of the United Kingdom as it does in those conventions that only allow sovereign state participation. These are ties that bind, not strangle. For the past 155 years, Hong Kong was inexorably linked to Great Britain and should be afforded similar privileges under United States law.

There is a dearth of cases addressing this issue because our federal courts have inherently recognized Hong Kong, as well as other British Dependent Territories. This Court recognized Bermuda for purposes of diversity jurisdiction, stating:

> [t]here is no question that diversity jurisdiction exists. NSC is a Bermuda corporation with its principal place of business in Bermuda .... the statutory and constitutional requirements of diversity jurisdiction are satisfied.

*Netherlands Shipmortgage Corp., Ltd. v. Madias,* 717 F.2d 731, 735 (2d Cir.1983). That same year, the Southern District recognized the Channel Islands for purposes of diversity jurisdiction even though they are "not a fully integrated part of the United Kingdom." *Cedec Trading Ltd. v. United Am. Coal Sales, Inc.,* 556 F.Supp. 722, 724 (S.D.N.Y.1983). It is interesting to note that the *Cedec* court recognized the Channel Islands even though they are specifically excluded as part of the United Kingdom under the Companies Act of 1948. One year later, the same court opined, in *dicta,* that Hong Kong is a "foreign state" for purposes of diversity jurisdiction stating: "[i]t would seem hypertechnical to preclude Hong Kong corporations from asserting claims in our courts simply because Hong Kong has not been formally recognized by the United States...." *Tetra Finance (HK) Ltd. v.*

*Shaheen,* 584 F.Supp. 847, 848 (S.D.N.Y. 1984).

Other courts follow this line of reasoning. The Seventh Circuit held that the Cayman Islands (as a British Dependent Territory) was a "foreign state" for purposes of diversity jurisdiction. *See Wilson v. Humphreys (Cayman), Ltd.,* 916 F.2d 1239, 1242 (7th Cir.1990) (relying on this Court's reasoning in *Netherlands Shipmortgage* ). In *Timco Engineering, Inc. v. Rex & Co., Inc.,* 603 F.Supp. 925, 930 n. 8 (E.D.Pa.1985) the court *sua sponte* found the reasoning of the Southern District of New York (in *Tetra Finance (HK)* ) to be persuasive and held that the presence of a Hong Kong citizen (plaintiff corporation) does not deprive the court of jurisdiction. In fact it is only *Windert* and its progeny[3] that urge "form" over "substance." Later cases reflect challenges to or outright rejection of *Windert's* reasoning.[4] But these cases, pro or con, were decided well before the full implications of reversion were realized.

The majority emphasizes the importance of affording deference to the Executive Branch. In fact, it extensively quotes from *Calderone* in which this Court sustained alienage diversity jurisdiction because the Executive Branch made its wishes known. *Calderone,* 325 F.2d at 77. In this case, the Department of State and the Department of Justice unequivocally made their wishes known—they withdrew support of *de facto* recognition of Hong Kong and urged this Court to recognize Hong Kong as a "citizen or subject" of the United Kingdom. Finally, although political and economic considerations are not the realm of the judiciary, the United States has strong economic and political interests in Hong Kong. *See* 22 U.S.C. § 5701(4); Department of State, 1996 Country Reports on Economic Policy and Trade Practices (through November 1996, Hong Kong's trade with the United States exceeded $23 billion).

---

**3.** *See St. Germain v. West Bay Leasing, Ltd.,* No. 81–CV–3945 (E.D.N.Y. Sept. 30, 1982); *Iran Handicraft and Carpet Export Ctr. v. Marjan Int'l Corp.,* 868 F.2d 1267 (2d Cir.1988).

**4.** *See Wilson,* 916 F.2d at 1243 ("the force of the *Windert* decision has been eroded by a more recent case from the same court." (referring to *Tetra Finance v. Shaheen,* 584 F.Supp. 847

(S.D.N.Y.1984))); *Creative Distribs., Ltd. v. Sari Niketan, Inc.,* No. 89 C 3614, 1989 WL 105210, at *2 (N.D.Ill. Sept.1, 1989) ("We are not persuaded by the Court's reasoning in *Windert*."); *Timco,* 603 F.Supp. at 930 n. 8 ("The *Windert* decision does not ... represent an unchallenged view of Hong Kong's status.").

The facts, actions and other factors discussed above, when considered in the aggregate, demonstrate an implicit willingness by Congress and an explicit request by the Executive Branch to permit a Hong Kong corporation to litigate its claims in our federal courts. Hong Kong is a unique and critical component in the scheme of international policies and global economic expansion. Access to our federal courts is justified without exceeding the boundaries of judicial authority. There are adequate constitutional, statutory and prudential grounds to open our federal courts to Matimak by: (1) recognizing Hong Kong as a "foreign state" for the limited purpose of alienage diversity jurisdiction; (2) recognizing Hong Kong as a political subdivision of a foreign state; or (3) recognizing Hong Kong's people and entities as "citizens or subjects" of the United Kingdom today and after July 1, 1997, of the People's Republic of China. Today's contrary conclusion opens the door to the very political entanglements the Constitution and § 1332 sought to avoid.